THEODORE E. MOBERG AND PAULINE MOBERG, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

VERN H. MOBERG AND RETA N. MOBERG, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 47880, 47925.   Filed February 24, 1961.

*Carl F. Bauersfeld, Esq.,* and *Charles H. Burton, Esq.,* for the petitioners.

*James D. Webb III, Esq.,* and *Wilford H. Payne, Esq.,* for the respondent.

OPINION.

BLACK, *Judge:* The principal issue presented is whether the agreements by which petitioners granted subfranchises under their master Dairy Queen franchise for Washington and Oregon were sales or some lesser disposition. Petitioners contend the agreements effected sales giving rise to long-term capital gain under the provisions of section 117(a) of the Internal Revenue Code of 1939.[1] Respondent

---

[1] SEC. 117. CAPITAL GAINS AND LOSSES.

(a) DEFINITIONS.—As used in this chapter—

(1) CAPITAL ASSETS.—The term "capital assets" means property held by the taxpayer (whether or not connected with his trade or business), but does not include stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, or property, used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23(1) * * *.

\* \* \* \* \* \* \*

(4) LONG-TERM CAPITAL GAIN.—The term "long-term capital gain" means gain from the sale or exchange of a capital asset held for more than 6 months, if and to the extent such gain is taken into account in computing net income;

contends that petitioners did not sell the subfranchises; that they retained controls over the rights granted which were inconsistent with sales; and that they merely granted sublicenses, payments for which constitute ordinary income.

Under the agreement with the McCulloughs, petitioners received the exclusive right to use Dairy Queen machines in Washington and Oregon. The right was subject to the limitations and restrictions set forth in our Findings of Fact. By implication, the agreement also accorded petitioners the right to use the trade name "Dairy Queen" in the 2-State area. It seems clear to us that under the agreement petitioners were territorial licensees of the McCulloughs' right to use the machines and trade name and not purchasers of the patent rights to make, use, and vend Dairy Queen machines. Cf. *Edward C. Myers*, 6 T.C. 258.

It does not follow, however, that because petitioners were but licensees the disposition of their rights is of necessity something less than a sale. No doubt is raised by the parties on that score and we are satisfied that the territorial franchise rights which petitioners held under the agreement with the McCulloughs constituted property susceptible of sale. *Jones v. Corbyn*, 186 F. 2d 450; *United States v. Jones*, 194 F. 2d 783. The question then becomes one of determining whether petitioners did in fact so divest themselves of all substantial rights under the franchise in a certain geographic area as to accomplish a sale, rather than a lesser transfer. We must look then to the agreements into which petitioners entered.

In our Findings of Fact we have given the substance of the provisions of the different contract agreements involved in this proceeding. Manifestly, it would not be practical to set out in this report the different contract agreements in full. We have carefully examined and considered the different provisions in these contracts and have summarized the provisions of the several contracts in the Findings of Fact. We are convinced that all these Dairy Queen franchises, with the exception of the one entered into in June 1948 with A. & M. Concessions, were sublicenses rather than sales due to the many restrictions and controls reserved by petitioners in the agreements. Therefore, we conclude that the proceeds therefrom are in the nature of royalties and constitute ordinary income rather than capital gains. We shall discuss later in this opinion the agreement entered into in June 1948 by petitioners with Concessions.

We had a similar issue to the one we have here in *Dairy Queen of Oklahoma, Inc.*, 26 T.C. 61 (1956), and we decided the issue in favor of the Commissioner and against the taxpayers. We were reversed in that case on this issue by the Tenth Circuit in *Dairy Queen of Oklahoma, Inc. v. Commissioner*, 250 F. 2d 503 (1957). Needless to

say, we have great respect for the views of the United States Court of Appeals for the Tenth Circuit and we have reexamined the question involved carefully and we conclude that we must adhere to the views on this issue which we expressed in *Dairy Queen of Oklahoma, Inc., supra.*

In *Joe L. Schmitt, Jr.*, 30 T.C. 322 (1958), affd. 271 F. 2d 301 (C.A. 9, 1959), we decided a somewhat similar issue to the one we have here and we decided it in favor of the Commissioner and against the taxpayer. In doing so, after reciting the several provisions of the contract agreements, we said:

We are of the opinion that the foregoing aspects of petitioner's relationship to the territorial franchise holder and the franchise itself are inconsistent with the position that he had disposed of all his substantial rights in the Exact-O-Matic System within each territorial area. It is important to note that we do not rest our conclusion upon any one of petitioner's retained interests or powers, and, without doubt, there are cases in which the reservation of some similar powers and rights has been held not to be fatal. We hold that *all* of the rights, powers, and continuing interests reserved by petitioner, *taken in combination*, are of such character as to be inconsistent with a "sale or exchange" of property by petitioner, and that Congress did not intend to confer the special benefits relating to sales of capital assets in such situations. It is no answer to say that a number of the rights reserved by petitioner were merely to protect his interest in the system or to insure full payment for the assignments. That reason may explain why such reservations were made, but it does not detract from the conclusion that petitioner did not in fact dispose of all his substantial interest in the system by reason of such reserved rights when taken together with all other reserved rights, powers, and interests.

Our decision in the *Schmitt* case was affirmed by the Ninth Circuit as we have stated above. Both our decision in the *Schmitt* case (1958) and its affirmance by the Ninth Circuit (1959) were subsequent to the *Dairy Queen of Oklahoma, Inc.*, case.

The facts in the instant case are so similar to those present in *Dairy Queen of Oklahoma, Inc.*, that we feel we would not be able to draw a valid distinction between the facts in the instant case and those which were present in that case. Therefore, for the reasons stated in our opinion on this issue in *Dairy Queen of Oklahoma, Inc.*, and of our decision in *Joe L. Schmitt, Jr.*, decided since the *Dairy Queen* case, we decide the first issue in favor of respondent, except as to the contract of sale entered into by petitioners and Concessions in June 1948.

We hold, except as noted, that the lump-sum payments, the gallonage payments, and the royalties are taxable as ordinary income and not as long-term capital gains.

Now as to the contract of sale entered into by petitioners with Concessions in June 1948, we hold that that was a sale. The facts with reference to this sale are set out in our Findings of Fact and need not

be repeated here. We also found as a fact that the territorial rights which petitioners sold to Concessions were not property which petitioners held primarily for sale in the ordinary course of their business. Therefore, petitioners are entitled to receive long-term capital gains treatment for whatever gain resulted to them from this sale to Concessions. As to this particular transaction, we hold in favor of petitioners.

The next question presented is whether, for the purpose of determining the gain upon the sales of subfranchises, petitioners are entitled to an allocation of their basis in the rights in the proportion which the 1940 population of each subfranchised area bears to the total 1940 population of Washington and Oregon. The evidence is clear and uncontroverted that in petitioners' negotiations with the McCulloughs, the basis used in arriving at the price for the master franchise was 1 cent per person living in those States, based on the 1940 census. The total figure thus computed was discounted from in excess of $28,000 to $24,000 because petitioners were taking a franchise for two rather than one State.

The petitioners point out in their brief that the Commissioner in his notice of deficiency did not allow the petitioners any cost basis whatsoever for the sales of sublicenses made by them in the years 1948, 1949, and 1950 in determining petitioners' gain on such sales. The Commissioner's answer to this contention of petitioners is that inasmuch as the subfranchises granted by petitioners were mere licenses and not sales of property, there was no occasion to allocate cost between the cost of petitioners' master franchise and the several subfranchises or licenses which they granted to others. We agree with this general contention of respondent. However, as has already been stated, we have held that one of the agreements in issue, namely, the one between petitioners and Concessions dated June 1948, was a sale. In reference to this sale, the parties have stipulated as follows:

> The tangible assets sold by the partnership, Dairy Queen Stores, Inc. to the A & M Concessions, Inc., on June 9, 1948 * * * had a remaining basis to the said partnership on the date of said sale in the amount of $6,535.89.

In view of this stipulation, in computing gain or loss on the sale made by petitioners to Concessions, the remaining basis of the tangible assets as stipulated should be used. Also, in allocating a portion of the cost of the master franchise which was $24,000 to the subfranchise which petitioners sold to Concessions, embracing all of Pierce County, Washington, the population formula contended by petitioners should be used. It seems to us that this formula is reasonable and fair, and should be used in a computation under Rule 50.

Reviewed by the Court.

*Decisions will be entered under Rule 50.*