Vern H. MOBERG and Reta N. Moberg, Petitioners,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

No. 19312.

United States Court of Appeals Fifth Circuit.

Aug. 1, 1962.

Robert Ash, Washington, D. C., Ash, Bauersfeld & Burton, Washington, D. C., of counsel), for petitioners.

Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, Atty., Dept. of Justice, Crane C. Hauser, Chief Counsel, John M. Morawski, Atty., I. R. S., Arthur E. Strout, and Harry Baum, Attys., Dept. of Justice, Washington, D. C., for respondent.

Before HUTCHESON, RIVES and BELL, Circuit Judges.

GRIFFIN B. BELL, Circuit Judge.

This appeal presents the issue of whether income received by taxpayers was ordinary income or income from the sale of a capital asset.[1] It is from a decision of the Tax Court. Moberg v. Commissioner of Internal Revenue, 1961, 35 T.C. 773.[2] The taxable years involved are 1948 and 1949.

Taxpayer and his brother, Theodore Moberg, each owned a one-half interest in a partnership known as "Dairy Queen Stores". By way of background, Harry M. Oltz secured patent No. 2080971 in 1937 on a "Freezing and Dispensing Machine" which later became known as the Dairy Queen machine. It was designed to freeze ice cream or ice milk mix and to hold it in the freezer until drawn out through a specially designed faucet. He sold his interest in the patent in 1940 to Ar-Tik Systems, Inc., and this company, together with Oltz, then granted to Hugh A. McCullough the exclusive right to use, manufacture, sell and distribute Dairy Queen machines in various parts of the United States including the states of Washington and Oregon, together with the right to sublicense others. This was in turn conveyed to a partnership consisting of Hugh A. and John F. McCullough. The trade name "Dairy Queen" was registered by them in Washington and Oregon. McCullough, under purchase of the patent, was to furnish the mix necessary to the end product.

Taxpayer here and his brother, as partners, contacted McCullough for the purpose of securing the exclusive right to the use of Dairy Queen freezers in the State of Washington. Negotiations culminated in their taking a franchise for both Washington and Oregon under an agreement dated April 10, 1947. The consideration for the agreement was $24,000 plus royalties determined on the basis of gallons of the formula mix used in the freezers. The Mobergs also received the right under the agreement to sublicense any portion of the territory granted to others upon the approval of McCullough with payment to be made to the McCulloughs in one-half of amounts received for sale of territory or sublicenses granted. The Mobergs agreed to obligate sublicensees to keep a record of serial numbers and locations of all freezers, to pay the royalty due, to permit the inspection of mix records and to agree not to move the freezers outside a sublicensed territory.

The Mobergs planned to attract investment capital with which to establish several corporations to operate Dairy Queen stores but soon realized that they would have to sell some of the territory under their franchise in order to raise

---

1. Taxpayers are husband and wife. The wife is a party to this appeal because she filed joint tax returns with her husband for the years in question.

2. This case was consolidated for trial and disposition in the Tax Court on the same record with the case of Theodore E. Moberg and Pauline Moberg v. Commissioner of Internal Revenue which case, involving the same issues as those here presented, is on appeal to the United States Court of Appeals for the Ninth Circuit.

sufficient capital to execute their plan. They opened a Dairy Queen store in Tacoma, Washington but it was not an immediate success and they were in financial distress on this account and because of outstanding debts including a payment due the McCulloughs on the purchase price of the franchise. They then sold the first franchise on December 17, 1947 for a fixed price payable partially in a lump sum upon execution of the agreement and partially on the basis of 15 cents per gallon of mix used plus a continuing royalty of 14 cents per gallon.[3] Contracts of this type were executed thereafter with ten additional purchasers.

Under these eleven agreements the purchaser received the right to use the trade name and freezers in an exclusive territory and was authorized to transfer or assign the agreement and his rights thereunder subject to all restrictions and obligations set out. The approval of the seller was required. The purchasers could procure the mix for the machines from sources selected by them. The rights conveyed were subject to the following restrictions:

(1) Assignment or transfer of the agreement subject to the approval of petitioners;

(2) Buyers to furnish petitioners the names of suppliers of mix;

(3) Petitioners, the McCulloughs, and Ar-Tik, Inc. to have the right to inspect the books of the buyers for the purpose of computing royalties;

(4) Buyers to maintain the freezers, building, and equipment in a high state of repair, and to keep the premises clean;

(5) Buyers to furnish the McCulloughs or Ar-Tik, Inc. the serial numbers and locations of freezers upon request.

(6) Buyers not to move freezers outside the territory granted for purposes of operation;

(7) Buyers to report the amount of mixes used monthly giving the serial number and location of the freezers covered by the report;

(8) Buyers to purchase all freezers through petitioners at manufacturing cost f.o.b. factory;

(9) Should buyers fail to make required payments as due, petitioners authorized to terminate the agreement upon written notice of thirty days and default continuing.

The next group of franchises was of the type referred in the Tax Court as the 34 cent contract with Harold E. and Ruth C. Spears. There were ten of this type. The consideration in each was a fixed amount payable partially in a lump sum payment and partially on delivery of the freezers, together making the fixed price, plus a continuing 34 cent royalty per gallon on all mix used. The Mobergs furnished the freezers under this contract. The purchasers received the right to assign or transfer the contract, exclusive right to use the freezers and the name Dairy Queen for the life of the freezer patent within the described territory and were to receive aid in opening the first store established. These grants were subject to the following restrictions:

(1) The freezer remained the property of petitioners;

(2) Buyer to install and maintain the freezers at his expense;

(3) The bookkeeping system employed by the buyer was subject to approval by petitioners;

(4) Buyer to maintain records on the store premises and to make them available to inspection by peti-

---

**3.** The fixed price consisted, under the terms of each contract here involved of a sum payable upon execution of the agreement plus a balance to be paid either upon delivery of the machines or upon the basis of a stated amount per gallon of mix, and is to be distinguished from the sums involved herein by way of royalty payments.

Taxpayer returned the royalty payments as ordinary income and the fixed prices as capital gains. He now contends that the royalty payments should also be given capital gains treatment.

tioners, the McCulloughs, and Ar-Tik, Inc.;

(5) Buyer to report mix used and pay royalty thereon monthly, giving the serial numbers and locations of freezers;

(6) Buyer to erect a store according to blueprints supplied by petitioners on a suitable lot with drive-in space available with construction to commence not later than a specified date;

(7) All mixes and supplies, including cones, cups, containers, topping, flavoring, coloring and like supplies and materials to meet standard of quality and specifications approved by petitioners;

(8) Buyer to paint and maintain the store in a high state of repair and cleanliness, and to maintain the premises by standards of quality and cleanliness set by petitioners;

(9) Buyer not to sell products other than Dairy Queen without approval of petitioners;

(10) Buyer to maintain no less than a specified number of stores for no less than a specified number of months each year;

(11) Buyer not to use any type of ice cream or ice milk freezer or equipment except Dairy Queen; and

(12) Default by the buyer in any of its obligations entitled petitioners to terminate the agreement without notice.

Some of this group of contracts could be assigned or transferred subject to the restrictions and obligations of the agreement without the consent of the seller. Some contained provisions additional or alternative to those set forth above, as follows:

(1) The buyer might select a mix supplier as he saw fit, but if the buyer failed to use high quality mix, petitioners might give him 30 days notice to improve the mix, and failing such, might designate the mix supplier;

(2) Upon request, the buyer was to give the McCulloughs or Ar-Tik, Inc. the serial numbers and locations of freezers;

(3) Buyer given right to assign the contract subject to the approval of petitioners and the McCulloughs;

(4) Upon any default by the buyer, petitioners might give 30 days notice to terminate the default, and upon the buyer's failure so to do, petitioners might terminate the contract; and

(5) If buyer failed to establish stores or make proper use of all of the territory granted, such unused territory to revert to petitioners.

Agreements referred to by the Tax Court as the 14 cent contract, the type entered into with Norman A. Williams, were next utilized. There were fourteen in this group with the buyer being granted the exclusive right to use two Dairy Queen freezers for each store opened and to use the trade name Dairy Queen in the specified territories in consideration of a fixed sum plus a royalty of 14 cents per gallon on all mix used. Some in this group could be assigned or transferred without the approval of seller. These grants were subject to the following restrictions:

(1) Buyer's bookkeeping system subject to the approval of petitioners;

(2) Buyer's selection of a mix supplier, subject to approval of petitioners;

(3) Buyer to report the amount of mix used, and pay the per gallon royalty thereon, monthly;

(4) Buyer to erect a Dairy Queen store according to blueprints supplied by petitioners on a suitable lot to accommodate a number of cars;

(5) All mixes and supplies, including cones, cups, containers, topping, flavoring, coloring and like supplies and materials to meet standard of quality and specifications approved by petitioners;

(6) Buyer not to use any type of ice cream or ice milk freezer or equipment except Dairy Queen;

(7) Buyer to paint and maintain the store in a high state of repair and cleanliness and to maintain the premises by standards of quality and cleanliness now or hereafter set up by the petitioners;

(8) Buyer to sell no product other than Dairy Queen without approval of petitioners;

(9) Buyer to maintain no less than at least one store for no less than a specified number of months each year; and

(10) Upon default by the buyer, petitioners might without notice, declare the agreement terminated.

Some of this group of contracts contained the following additional or alternative provisions:

(1) Buyer to require his mix supplier to furnish petitioners with a monthly record of sales of mix to the grantee;

(2) Upon any default by the buyer, petitioners might give 30 days notice to terminate the default, and upon the buyer's failure so to do, petitioners might terminate the contract;

(3) If the buyer failed to establish stores or make proper use of all of the territory granted, such unused territory to revert to petitioners;

(4) Buyer to purchase all freezers through petitioners at cost of manufacturing f.o.b. factory; and

(5) Any assignment of the agreement by the buyer subject to approval of petitioners.

In addition an agreement was executed with Thompsons' Freeze Incorporated granting the exclusive right to use the Dairy Queen freezer in King County, Washington subject to the following restrictions:

(1) The freezers purchased by Freeze not to be moved outside King County;

(2) Any assignment of the agreement by Freeze subject to approval by petitioners, the McCulloughs, and Ar-Tik;

(3) If the mix used by Freeze was not of high quality, petitioners might give Freeze 30 days notice to improve the quality, failing which, they could require Freeze to select and use another supplier of mix;

(4) Petitioners, the McCulloughs, and Ar-Tik could inspect the records of all Dairy Queen stores established by Freeze;

(5) Freeze to maintain the freezers, building, and equipment in a high state of repair, and to keep the premises clean;

(6) Freeze to give to the McCulloughs or Ar-Tik the serial numbers and locations of freezers upon request, and give petitioners access to such records and supply same with monthly reports of mix used;

(7) Freeze to order all freezers required through petitioners at manufacturing cost f.o.b. factory;

(8) Freeze to establish and commence operation of two stores on or before each of three specified dates; and

(9) If Freeze failed to make required payments as due, petitioners could give written notice, and if Freeze failed to make the required payments within 30 days of the notice, petitioners could terminate the agreement.

The consideration for this contract was $25,000; $10,000 payable upon the execution of the agreement with the balance to be paid at the rate of 15 cents per gallon on all mixes used or sold; "provided, however, that if such amount shall be less than the following amounts, that the latter shall govern the payments:

"August 1, 1949      $6,000
August 1, 1950      $9,000"

This quoted provision was standard in all contracts where a part of the fixed price was deferred, i. e., the portion of the fixed price to be paid on the basis of mix used contained a lump sum maturity.

The contracts also set out the royalty due and recited the royalty due the McCulloughs by the Mobergs.

The Tax Court held that the franchises granted were sublicenses due to the restrictions and controls reserved by petitioners rather than sales, and for that reason concluded that all proceeds from the agreement were in the nature of royalties, constituting ordinary income rather than capital gains.[4] The additional questions of whether the subfranchise rights sold were held primarily for sale to customers in the ordinary course of business within the meaning of the statute so as not to constitute capital assets, and whether in computing the gains from the sale the taxpayer is entitled to allocate a portion of the cost of the master franchise to the subfranchises were not reached in view of this holding.

This case involves subfranchise agreements substantially similar to those before the Court of Appeals for the Tenth Circuit where it was determined that the transfers were sales of a capital asset and that the proceeds therefrom were entitled to capital gains treatment. Dairy Queen of Oklahoma, Inc. v. Commissioner, 10 Cir., 1957, 250 F.2d 503. It, too, was an appeal from the Tax Court. Dairy Queen of Oklahoma, Inc. v. Commissioner of Internal Revenue, 1956, 26 T.C. 61. Judge Lewis of that court dissented on the ground that the franchise could not be separated from the subject matter of the franchise, and since control of the subject matter, the product, was retained from manufacture to sale, there was no sale of the franchise itself. The reasoning of the majority was that the taxpayer conveyed a single bundle of rights which collectively consisted of the sale of the exclusive and perpetual right to make and sell a trade-marked product within a designated territory. It was the sale of the proprietary right in a capital asset—the franchise and the restrictions on the franchise were not such as to reserve to the grantor any property or proprietary right in the franchise.

Just as was the case here, that taxpayer returned the fixed price or lump sum payments as capital gains and the payments received by way of royalty as ordinary income but took the position in the Tax Court that all was entitled to capital gains treatment. The court agreed.

The Tax Court in this case refused to follow the decision of the Tenth Circuit, choosing instead to follow Schmitt v. Commissioner of Internal Revenue, 1958, 30 T.C. 322, affirmed, 9 Cir., 1959, 271 F.2d 301, where the Tenth Circuit Dairy Queen decision was considered, criticized and distinguished. Schmitt involved a territorial assignment of the patent to the Exact-O-Matic System of accounting, a mechanical process; and both the Tax Court and the Court of Appeals concluded that the taxpayer had not disposed of all of his substantial rights in the patent property. The transfers were therefore licenses and not sales. We deal with a franchise of which the use of the patented device is only a part. The patent was a more substantial part of the franchise in Schmitt but admittedly the rights retained by the grantor closely parallel the restrictions here.

Another circuit in the meantime has considered the problem of the Dairy Queen franchise and subfranchises for Virginia. Gowdey v. Commissioner of Internal Revenue, 4 Cir., 1962, 307 F.2d 816. That court on facts substantially similar held that the lump sum payments to taxpayer for the various subfranchises granted should be assessed as receipts

4. The Mobergs sold a franchise for Pierce County, Washington to A. & M. Concessions, Inc. including the store which had already been established, and the equipment therein for the sum of $12,480 payable on execution of the agreement plus the sum of 25 cents per gallon of mix used on 48,000 gallons payable monthly on the basis of 16,000 gallons annually. In addition the buyers agreed to pay a royalty of 14 cents per gallon on all mix used in all freezers in the territory of the franchise. The Tax Court held that the gain from this sale qualified for long term capital gains treatment for such gain as resulted to the Mobergs.

from the sale of capital assets. However, the treatment to be given receipts by way of royalties is not discussed in the opinion. That court considered the sale to be of the use of the machine, trade mark and mix product, and that all substantial rights in the use were conveyed.

We have carefully considered the restrictions in the subfranchises granted. The various restrictive categories were designed to maintain quality, sanitary dispensing conditions, uniform standards for the trade named product, protect each subfranchise purchaser as against other purchasers in respect to territory, protect the seller in respect to the contract with the McCulloughs, and to insure the ascertainment and collection of contractual sums due by way of fixed prices and royalties. These restrictions were consistent with a sale of the franchise to use the machine and trademark in an exclusive territory.

■■ The traditional test of ownership is the power to exclude others and that test was met here. Taxation is concerned with command over the property, not refinement of title. Corliss v. Bowers, 1930, 281 U.S. 376, 50 S.Ct. 336, 74 L.Ed. 916; Griffiths v. Helvering, 1939, 308 U.S. 355, 60 S.Ct. 277, 84 L.Ed. 319. The provision that the agreements might not be transferred or assigned without the permission of the McCulloughs, and in most cases the seller, taxpayer here and his brother, and also with respect to the termination provisions did not avoid the sales. We held in Allen v. Werner, 5 Cir., 1951, 190 F.2d 840, that a provision prohibiting unlimited assignment and another providing for termination upon default would not defeat the sale of a patent. We followed Allen v. Werner in Lawrence v. United States, 5 Cir., 1957, 242 F.2d 542 as to the right of termination upon default. We held that possibility to be a condition subsequent which would not negate the sale.

■ The transactions with which we are concerned purported to be sales. The sole question is whether the reservations and restrictions in the agreements were of such a nature as to render the grants mere licenses. We hold that they were not. They were sales of the exclusive and perpetual right to use the Dairy Queen trademark and freezer in specified territories. The income received by way of fixed prices is entitled to capital gains treatment within the meaning of the statute provided the transactions meet the other terms of the statute.

■ The question of the royalties qualifying for capital gains treatment cannot now be decided. The cases of Dairy Queen of Oklahoma, supra; Commissioner of Internal Revenue v. Hopkinson, 2 Cir., 1942, 126 F.2d 406; and Jones v. United States, D.Col., 1951, 96 F.Supp. 973, affirmed, 10 Cir., 1952, 194 F.2d 783 make it clear that capital gains treatment is not lost by providing for payments contingent on future sales. However, we are unable to determine from the record, nor apparently did the Tax Court consider the question, whether the royalties were a part of the sales price of the subfranchises.

We remand so that the Tax Court may determine this question of fact, after first determining whether the assets sold, the subfranchises, were held primarily for sale in the ordinary course of business so as not to constitute capital assets giving rise to capital gains. The further question of whether taxpayers, if the assets were not held primarily for sale to customers in the ordinary course of business, was entitled to allocate a portion of the cost of his master franchise to the subfranchises must also be determined.

The decision of the Tax Court is reversed and remanded for further proceedings not inconsistent herewith.