GRINERS' AND SHAW, INC., Plaintiff,

v.

FEDERAL INSURANCE COMPANY, Seaboard Surety Company, American Reinsurance Company, and Insurance Company of North America, Defendants.

Civ. A. No. AC–1213.

United States District Court
E. D. South Carolina,
Columbia Division.

Oct. 24, 1964.

Taylor B. Rion, Jr., Graydon, Davis & Sawyer, Columbia, S. C., for plaintiff.

Wright, Scott, Blackwell & Powers, Florence, S. C., for defendants Federal Ins. Co., Seaboard Surety Co. and American Reinsurance Co.

Turner, Padget, Graham & Laney, Columbia, S. C., for defendant Insurance Co. of North America.

SIMONS, District Judge.

The question presented involves the application of the provisions of the Miller Act [40 U.S.C.A. §§ 270a–270d] to a contract for the completion of a Capehart housing project entered into by the United States, of the one part, and a joint venture composed of T. A. Loving and Company and Harllee-Quattlebaum Construction Company, Inc., of the other part. For a full understanding of the issues involved, the factual background must be set out in some detail.

In 1959, the Department of the Navy, in order to provide housing for Marine personnel at Camp LeJeune, North Carolina, utilized the provisions of the legislation known as the Capehart Act.[1] In brief, the Capehart Act provides for the erection of urgently needed military housing by private contractors, using private mortgage capital, on land owned by the government and leased to a corporation designated as "mortgagor-builder," with the mortgage indebtedness to be repaid by amortized payments realized from quarters allowances of eligible service personnel.

On March 30, 1959, the Department of the Navy entered into a contract with Atlantic Contractors, Inc., as the "eligible builder" and First Camp LeJeune Quarters, Inc., Second Camp LeJeune Quarters, Inc., Third Camp LeJeune Quarters, Inc., Fourth Camp LeJeune Quarters, Inc., Fifth Camp LeJeune Quarters, Inc., and Sixth Camp LeJeune Quarters, Inc., all Delaware corporations, as "mortgagor-builders" for the construction of eight hundred [800] units of housing at Camp LeJeune, for a total contract price of Twelve Million, Nine Hundred Forty Thousand, Eight Hundred and 00/100 [$12,940,800.00] Dollars. The mortgagor-builder corporations were set up by the eligible builder, and the president and assistant secretary of the six housing corporations were also president and assistant secretary of the eligible builder. Following the mechanics of Capehart procedure, the mortgagor-builder corporations were allocated certain housing areas and leases were executed by the Navy, acting for the United States, to the respective corporations for fifty-five [55] year terms. Mortgages covering the said areas were executed to the National Commercial Bank & Trust Company of Albany, New York, to secure funds to cover construction under the contract.

Contemporaneously therewith, or immediately following the incorporation of the mortgagor-builder corporations, the stockholders thereof delivered the certificates for all capital stock of said corporations to the eligible builder for deposit in escrow with the mortgagee bank, with appropriate assignment, along with letters containing their resignations as officers and directors, effective upon completion of the construction and acceptance by the Navy. Upon acceptance, the government would then become the owner of all of the stock of the mortgagor builder corporations.

Thereafter, Atlantic Contractors, Inc., began construction under the contract, and continued work until some time in 1961, when it was declared in default by the Navy, the project being approximately half-completed. Following considerable activity and discussion among the prime contractor's surety, the mortgagee bank, the FHA, and the Navy, the mortgagee bank declined to undertake the completion of the project, whereupon the FHA issued its debentures to the mortgagee bank and the notes and mortgages were assigned to the Federal Housing Commissioner. At the same time, the certificates for the capital stock of the housing corporations, with assignment endorsed thereon, together with the letters of resignation of the officers-directors, were likewise delivered to the FHA.

The government, then, through the Department of the Navy, by delegation from the Federal Housing Commissioner, nego-

1. Title 42 U.S.C.A. § 1594 et seq.; amended in 1956, 70 Stat. 1109–1110.

tiated a contract with the joint venture, T. A. Loving and Company/Harllee-Quattlebaum Construction Company, Inc., hereinafter sometimes referred to as "Loving-Quattlebaum" or the "joint venture", for the completion of the project.

This contract, entitled "Armed Services Housing Department of the Navy Completion Contract", was effective April 24, 1961, and called for the total payment of Six Million, Two Hundred Thousand and 00/100 [$6,200,000.00] Dollars, allocated among the six mortgage areas, and required completion pursuant to a schedule set forth therein. The *sole parties* to this contract were the United States of America, acting through the Naval Contracting Officer of the Fifth Naval District, and the joint venture.

Thereafter, the joint venture furnished to the United States of America payment and performance bonds issued by the defendants Federal Insurance Company, Seaboard Surety Company and American Reinsurance Company. The obligees named in the bonds were the United States of America and the six housing corporations, First, Second, Third, Fourth, Fifth and Sixth Camp LeJeune Quarters, Inc., and the penal sum of each bond was Six Million, Two Hundred Thousand and 00/100 [$6,200,000.00] Dollars, the completion contract amount.

On or about May 2, 1961, the joint venture entered into a written subcontract with Griners' and Shaw, Inc., a South Carolina corporation, with offices in Columbia, South Carolina, to do certain grading, planting, excavating and landscaping work required for the project for the subcontract price of Three Hundred Ten Thousand and 00/100 [$310,000.00] Dollars, increased by changes subsequently made by the parties to the sum of Three Hundred Forty-four Thousand, Six Hundred Twenty-two and 62/100 [$344,622.62] Dollars. Griners' and Shaw, Inc., furnished to Loving-Quattlebaum, the joint venture, subcontract payment and performance bonds written by the defendant Insurance Company of North America, each in the subcontract sum of Three Hundred Ten

Thousand and 00/100 [$310,000.00] Dollars.

Griners' and Shaw, Inc., began the work and thereafter on or about June 11, 1962, the joint venture declared Griners' and Shaw, Inc., to be in default and notified the surety, Insurance Company of North America, which elected to take over the performance of the subcontract and did have it completed. At the time of the claimed default, Griners' and Shaw, Inc., had been paid Two Hundred Eighty Thousand, Seven Hundred Ninety-two and 52/100 [$280,792.52] Dollars on the revised contract total of Three Hundred Forty-four Thousand, Six Hundred Twenty-two and 62/100 [$344,622.62] Dollars. Insurance Company of North America used Griners' and Shaw, Inc., for completion of the subcontract following the declaration of default.

The present action was instituted in the Eastern District Court of South Carolina by Griners' and Shaw, Inc., against Federal Insurance Company, Seaboard Surety Company and American Reinsurance Company [sureties on the Completion Contract], and Insurance Company of North America [surety for Griners' and Shaw, Inc., on the subcontract].

The first cause of action seeks to recover for alleged labor and materials furnished to the job, and relates to all defendants.

The second cause of action seeks a recovery for alleged extra work, not included in the revised contract figure, and relates to the three sureties for the joint venture only.

The next three causes of action seek recovery from Insurance Company of North America for alleged rental of equipment and other matters arising out of the relations between Griners' and Shaw, Inc., and its surety in the work performed after the declaration of default. The sixth cause of action alleges a breach of the subcontracting agreement by the joint and several acts of T. A. Loving and Company and Harllee-Quattlebaum Construction Company, Inc., and

the Insurance Company of North America, and seeks damages against the latter defendant for such alleged breach.

The defendant Insurance Company of North America moved to bring in Mrs. W. A. Griner, Roy C. Jordan, William A. Griner, Jr., and Marshall L. Shaw as additional defendants or involuntary plaintiffs upon the ground that they were indispensable and necessary parties to a complete determination of the causes of action relating to Insurance Company of North America, and this court, following hearing, ordered that the said parties be brought in. Insurance Company of North America then answered the complaint and asserted a counterclaim against the plaintiff Griners' and Shaw, Inc., and the additional individuals mentioned above alleging that they were co-partners with and guarantors for Griners' and Shaw, Inc.

Federal Insurance Company, Seaboard Surety Company and American Reinsurance Company answered and in their first defense, alleged that the plaintiff is without capacity to bring this action in its own name since the action was one upon a bond or bonds furnished to the United States in connection with a public works project of the United States, and that under the Miller Act,[2] such action should have been brought in the name of the United States as use plaintiff.

In their second defense, these defendants alleged that this completion contract is a contract with the United States for a public work of the United States, that this suit, being upon the bonds furnished in connection therewith, was governed by the Miller Act, and that the action should be either dismissed or changed to the District Court for the Eastern District of North Carolina, the district wherein the Camp LeJeune contract was to be performed and executed.

In their third and fourth defenses, they alleged that the joint venture sustained extensive losses by reason of the failure of the plaintiff, Griners' and Shaw, Inc., to perform its subcontract; that if the plaintiff were entitled to recover anything at all, such amounts owing the joint venture would more than offset any amount owing to plaintiff. They further say that they are entitled to the benefit of such offsets, and that the joint venture should be made a party to the action in order to assert whatever claims it may have against the plaintiff for damages resulting from its default and failure to perform its subcontract.

Along with their answer, said defendants served notice of a motion: [a] to make the United States a party plaintiff for the use and benefit of Griners' and Shaw, Inc.; [b] to dismiss this action, or in lieu thereof, to change the venue thereof to the Eastern District of North Carolina, the district in which the LeJeune contract was to be, and actually was, performed; and, [c] to make the joint venture a party defendant in order that it might assert its alleged causes of action against the plaintiff, and that all questions at issue might be settled and determined in one action.

Counsel for Griners' and Shaw, Inc., correctly state the question for decision to be as follows:

"Is the Miller Act [40 U.S.C.A. 270] applicable to this suit as a 'contract exceeding Two Thousand [$2000] Dollars in amount, for the construction, alteration, or repair of any public building or public work of the United States'?"

Plaintiff concedes that if the Miller Act applies, this suit will lie only in the United States District Court for the Eastern District of North Carolina "in which the contract was to be performed [Section 270b. [b]."

If the Miller Act does not apply, then the action may be maintained in this court, which has jurisdiction of the plaintiff and the defendants.

2. 40 U.S.C.A. § 270b [b]: "Every suit instituted under this section shall be brought in the name of the United States for the use of the person suing, in the United States District Court for any district in which the contract was to be performed and executed and not elsewhere * * *."

The gist of the plaintiff's position is that Capehart housing, while in a sense a public work of the United States Government, is a type of housing provided for by specific statute having its own bond requirements, to the exclusion of the Miller Act. Such government housing, it is claimed, is *sui generis*, which differs from conventional government construction in certain significant respects and that the provisions of the Miller Act do not apply to Capehart contractors and their sureties.[3]

As support for its position, plaintiff cites the cases of United States for Use and Benefit of Miles Lumber Co. v. Harrison and Grimshaw Construction Co., 305 F.2d 363 [10th Cir. 1962], and Continental Casualty Company v. United States, 305 F.2d 794 [8th Cir. 1962] the former being a decision of the Tenth Circuit [by a divided court], and the latter a decision of the Eighth Circuit, in both of which the court concluded that the provisions of the Miller Act did not apply to Capehart construction contracts and Capehart bonds.

The defendants rely upon Lasley v. United States, 285 F.2d 98 [5th Cir. 1960], wherein the Fifth Circuit Court of Appeals reached the conclusion that the Miller Act did apply to Capehart bonds except as varied by the limited provisions of the Capehart Act itself.[4] The court said that though the Capehart Act contained provisions relating to the bonds required, and provided that the furnishing of such should be deemed sufficient compliance with the provisions of the Miller Act, still the purpose of the bonding provisions in the Capehart Act was merely to substitute such bond for the bond described in the Miller Act, and that the remainder of the provisions of the Miller Act would apply to the Capehart bond just as they do to a Miller Act bond.

In the Harrison and Grimshaw case, the original contract for the Capehart project, and the performance and payment bonds furnished on the original contract were involved. The majority opinion goes into a detailed analysis of the nature of Capehart construction, recognizing that while it is public housing, it is erected to meet a particular need for armed services housing and under the original Capehart method of contracting, such military housing is financed by private mortgage capital retired on an amortized basis through funds realized from the quarters allowance of eligible service personnel. It points out that the Capehart Act requires the furnishing by the contractor of performance and payment bonds with surety or sureties satisfactory to the Secretary of Defense, or his designee, and that the furnishing of such bonds shall be deemed a sufficient compliance with the provisions of Section 270a of Title 40, and no additional bond shall be required under such section.

There was an especially strong dissenting opinion in the Harrison and Grimshaw case by Judge Pickett, who cited Lasley v. United States, supra, with whose reasoning he was in agreement, and concluded that Capehart housing was definitely a public work of the United States, and that the provisions relating to the performance and payment bonds merely provided for the type bond and did not preclude the application of the procedural provisions of the Miller Act. He said:

"There could be no purpose or reason for Congress to state that the furnishing of a bond should be deemed a sufficient compliance with the provisions of Section 1 of the Miller Act if it was not intended that the bond furnished would be considered a Miller Act bond from that point forward." [5]

3. 42 U.S.C.A. § 1594(a): " * * * Any such contract shall provide for the furnishing by the contractor of a performance bond and a payment bond with a surety or sureties satisfactory to the Secretary of Defense, or his designee, and the furnishing of such bonds shall be

deemed a sufficient compliance with the provisions of section 270a of Title 40, and no additional bonds shall be required under such section. * * * "

4. See 3, supra.

5. 305 F.2d 371.

The Continental Casualty Company case, supra, cited by the plaintiff held that the notice requirements inserted in the Capehart construction contract bond superseded the notice requirements of the Miller Act. The court there again analyzed the Capehart Act, and in connection with the bond requirements, concluded that

"* * * had Congress intended for the procedural provisions of the Miller Act to apply to Capehart contractors and their sureties, it simply would have said so." [305 F.2d page 799]

In a concurring opinion, Judge Blackmun, conceding that the point was very close, based his concurrence on a number of factors, included among which were what he regarded as unclear or ambiguous language in the act, and the unexplained failure of the plaintiff to take the "small trouble to give the dual notice so clearly required by the bond." [6]

In Lasley v. United States [7]; a subcontractor on a Capehart housing project at Fort Bliss, Texas, brought an action by the United States as use plaintiff against the contractor and its surety under the provisions of the Miller Act. The defendants moved to dismiss for lack of jurisdiction upon the ground that there was no diversity and that the Miller Act did not apply to Capehart construction and therefore the court had no jurisdiction. The District Court held that jurisdiction was conferred upon it by the Miller Act and the case proceeded to judgment. The Fifth Circuit Court of Appeals affirmed, using the following language:

"* * * We think it clear that Congress considered that but for the provisions of the Capehart Act, quoted above, a contractor would be required to supply a builder with a Miller Act bond before entering upon a Capehart construction job, because such a project falls within the language 'construction * * * of any public building or public work of the United States;' that the purpose of the bonding provisions in the Capehart Act was merely to substitute it for the bond described in 40 U.S.C.A. § 270b[b], quoted above, and that the remainder of the provisions of the Miller Act would apply to the Capehart bond just as they do to a Miller Act bond. * * *" [8]

■ Conceding that there is a split of authority on the question of whether the Miller Act applies to Capehart bonds, it is not necessary for a decision of the instant case to adopt either view. In passing, it is the opinion of this court that the Lasley case represents the better reasoned viewpoint, and that except as modified by the language of the Capehart Act relating to the furnishing of bonds, the Miller Act, which is a general act applying to bonds for public works of the government, applies from that point forward.

■ However, in the instant case, there are differences in the factual situation which impel the conclusion that the Miller Act applies to the completion contract involved here and the payment and performance bonds given to the United States Government and the subsidiary housing corporations, which, in effect, were the property of the United States Government. It is to be noted that the completion contract was solely between *the United States of America*, acting through the Department of the Navy, by delegation of the Federal Housing Commissioner and *the primary completion contractor*. While originally a contract for the construction of public housing for members of the Marine Corps under a conventional Capehart construction contract, following the default of the primary contractor and the election of the mortgagee bank not to complete, the contract for the completion then became a direct contract between the United States of America and the completion contractor

6.  305 F.2d 800.
7.  285 F.2d 98.

8.  285 F.2d 100.

and came within the purview of 270a of the Miller Act as a

> " * * * contract, exceeding [Two Thousand] $2000 [Dollars] in amount for the construction * * * of any public building or public work of the United States * * *."

The land upon which the construction was built was at all times owned by the government, and following default and the issuance of debentures by the FHA to the mortgagee bank, and the assignment of the capital stock of the housing corporations and the resignation of their officers and directors, the government then became the owner, not only of the land on which the project was situated, but of the corporations which were the lessees of such land.

It should be noted that in the original Capehart bond the United States is not an obligee, the obligees being the First, Second, Third, Fourth, Fifth and Sixth Camp LeJeune Quarters, Inc., the mortgagor-builders, and the National Commercial Bank & Trust Company of Albany, New York, the mortgagee. In the performance and payment bonds supplied by Federal Insurance Company and its co-sureties, the obligees named are the six housing corporations and the United States of America. By reference to the completion contract, to which the United States is a party and to which the housing corporations are not, it is at once perceived that the United States is the primary obligee named in these bonds. In addition, as noted herein, the United States was also the real owner of the housing corporations themselves.

9. 186 F.Supp. 648.

10. 186 F.Supp. 644.

11. § 1594(a) of Title 42.

12. See Autrey v. Williams and Dunlap, 185 F.Supp. 802, [D.C.La.1960].

13. The case of United States for the use of General Accident, Fire & Life Assurance Corporation v. Maguire Homes, Inc., D.C.Mass.1959, 186 F.Supp. 659, is sometimes cited to the effect that the Miller Act and the Capehart Act bond requirements both contemplate bonds in which

This point gave some initial concern by reason of certain wording of the decision in United States to Use of Acme Furnace Fitting Co. v. Fort George G. Meade, etc., 186 F.Supp. 639 [D.C.Md., 1960], wherein the court states that in Miller Act bonds, the United States must be named as the sole obligee. There, suit was brought by a supplier on a Capehart construction project against the contractor and sureties for materials furnished and delivered. Jurisdiction was originally invoked under the Miller Act, and by amendment, under both the Miller Act and the Capehart Act. The United States was not named as an obligee in the bond.[9]

The court first determined that the bond in question was neither in form or in fact a Miller Act bond, and in the course of its ruling, stated that the United States must be the sole *obligee* on a Miller Act bond.[10] However, the court went on to hold that the bond was indeed a Capehart bond, and that except as specifically changed by the requirements of the 1956 amendment to the Capehart Act,[11] the Miller Act was *in pari materia,* and that the remainder of the provisions of the Miller Act applied to Capehart bonds; that construed together, the two acts gave the district court jurisdiction of the action brought by the use-plaintiff.[12]

It would appear that the words of the court that the United States must be the sole obligee on a Miller Act bond are unnecessary to the decision reached, as the United States was not named as *an* obligee on the bond there involved.[13]

> the United States is the obligee and that when the bond names a private corporation as obligee, neither the bonding provisions of the Miller Act nor the Capehart Act give the District Court jurisdiction. The court in the Meade case cites two unreported decisions to the effect that the Miller Act contemplates a bond with the United States as the sole obligee. These cases are Octeau v. American Surety Co. of N. Y. [D.C. R.I., CA 2419] and Westinghouse Electric Supply Co., et al v. McGuire Homes, Inc., [D.C.R.I., 1959, CA 2449].

In any event, in the instant case, the United States was directly named as obligee, and, in effect, was the *sole* obligee.

Conceding that the construction contract originally executed for this housing was a Capehart contract, it does not necessarily follow that, default having occurred and the government having undertaken completion, the contract for such completion is a Capehart contract. On the contrary, there are very important differences, sufficient in the opinion of the court to compel the conclusion that the completion contract itself is not a Capehart contract. It is to be remembered that in the Harrison and Grimshaw case, supra, and the Continental Casualty Company case, supra, the court was dealing with the original Capehart contract and the bonds furnished in connection with those contracts. There, apparently the United States was not an obligee in the bonds. The contracts for Capehart construction are let under specific provisions of the Capehart Act. For instance, there must be competitive bidding.

In the instant case the contract was negotiated directly by the government with the contractor and there was no competitive bidding. As far as the completion contract is concerned, the parties are different from those in the original contract, and the original contract is really not involved except insofar as the plans and specifications for proper completion were applicable.

By reference to the preamble of the completion contract, it is seen that the Federal Housing Commissioner was made the assignee of the notes and mortgages held by the private lending agency originally advancing the funds for the Capehart construction, and that the comple-

tion contract was to be paid for with the remaining funds derived from the mortgage and "if necessary the resources of the Armed Services Housing Mortgage Insurance Fund." [14]

█ It is the conclusion of the court that the Miller Act does apply to the completion contract in the instant case. The question then arises whether the Miller Act relates to venue or jurisdiction, that is, does it require a dismissal of this action or is the court within its power to change the venue to the Eastern District of North Carolina, the appropriate district under the Miller Act, being the district in which the contract was to be performed and executed.

In the case of United States for Use and Benefit of Fairbanks Morse & Co. v. Bero Construction Corporation, 148 F. Supp. 295 [S.D.N.Y., 1957] the court held that the Miller Act provision 270b [b] relates to jurisdiction.

To the contrary is the case of United States to Use and Benefit of Bailey-Lewis-Williams of Florida, Inc. v. Peter Kiewit Sons Company of Canada, Ltd., 195 F.Supp. 752 [D.C.D.C., 1961]; affirmed, Indemnity Insurance Company of North America v. United States to Use and Benefit of Bailey-Lewis-Williams of Florida, Inc., 112 U.S.App.D.C. 99, 299 F.2d 930 [1962]. See also Texas Construction Company v. United States, 236 F.2d 138, 139 [5th Cir. 1956], holding that the Miller Act is a restriction on venue rather than on the power of the court to entertain the action.

Title 28 U.S.C.A. § 1406(a), gives this court the power to transfer a case, in the interest of justice, to any district or division in which it could have been brought.

Having concluded that the Miller Act governs, the appropriate district for trial

14. It is the opinion of the Department of the Navy that the completion contract is not a Capehart contract. By letter of 26 June 1964, of S. P. Claud, Counsel for the Atlantic Division, Bureau of Yards and Docks, Department of the Navy, it is stated that the completion contract is not to be considered as a Capehart housing contract, but one essen-

tially for construction only. This letter concluded as follows: "Your contract was essentially for construction only. It was a negotiated contract, based upon proposals, and did not involve, in any way, Capehart bid procedure. Nor did it involve, in any way, the many other factors which enter into a Capehart housing contract."

of this case is the Eastern District Court of North Carolina, wherein the contract was to be performed. Upon full consideration of the very complicated issues presented in the instant case, including the claims, counterclaims and cross claims of the parties, it is the court's opinion that it would be in the interest of justice to transfer the entire case to that district court. Strong reasons of convenience buttress this conclusion.

There remain the two additional parts of the defendants' motion, to make the United States a party as use plaintiff, and to make the joint venture a party defendant.

 It appears that the United States is a mere nominal or formal party to such an action and amendment may be freely made to name the United States as a party. Blanchard v. Terry & Wright, Inc., 218 F.Supp. 910 [W.D. Kentucky, 1963]. In United States ex rel. Maxwell v. Barrett, 135 F. 189 [N.D. Cal.1905], it was stated that the omission to name the United States as a party is "at the worst, a mere formal irregularity, and should not affect either the jurisdiction of the court or the merits of the controversy."

In order to comply with the formal requirements of the statute, the United States should have been named a party plaintiff for the use and benefit of Griners' and Shaw, Inc. Since Griners' and Shaw, Inc., have claims asserted in this action which they elected to bring against the Insurance Company of North America and which are not under the Miller Act, Griners' and Shaw, Inc., may remain as an individual plaintiff.

It further appears to the court that T. A. Loving and Company/Harllee-Quattlebaum Construction Company, Inc., the joint venture, should be brought in as a party defendant in order to assert whatever claim it has arising out of the complicated factual situation involved herein in order that a full determination of the issues might be had in the one action.

In summary, it is the judgment of the court that the Miller Act applies to the action brought by Griners' and Shaw, Inc., against the three moving defendants herein, and that the said defendants have not waived the right to object to the venue and to insist upon transfer of the case to the appropriate district court, i. e., the Eastern District Court of North Carolina, for disposition of the case; that it is in the interest of justice that the case in its entirety be transferred to such district court; that the United States be made a party plaintiff for the use and benefit of Griners' and Shaw, Inc.; that T. A. Loving and Company/Harllee-Quattlebaum Construction Company, Inc., the joint venture, be made a party defendant to the cause and allowed thirty days in which to plead as it may deem to its best interest.

Judgment accordingly.