250 F.2d 503
 DAIRY QUEEN OF OKLAHOMA, Inc., dissolved, Petitioner,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent.
L. H. NEHRING, Trustee, Petitioner,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent.
Priscilla NEHRING, Trustee, Petitioner,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent,
L. E. COPELIN, Trustee, Petitioner,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent.
 Nos. 5562-5565.
 United States Court of Appeals Tenth Circuit.
 December 3, 1957.
 
 Robert Ash, Washington, D. C. (Charles H. Burton, Washington, D. C., was with him on the brief), for petitioners.
 Arthur I. Gould, Washington, D. C. (John N. Stull, Lee A. Jackson and A. F. Prescott, Washington, D. C., were with him on the brief), for respondent.
 Before MURRAH, PICKETT and LEWIS, Circuit Judges.
 MURRAH, Circuit Judge.
 
 
 1
 This appeal presents the familiar, yet still perplexing, question whether income to the taxpayer for the grant of a right to the exclusive use of a patented machine and the sale of its trade-name product, is ordinary income, as the Commissioner determined and the Tax Court held, or capital gain, as the petitioner-taxpayer contends. Admittedly the question is resolved by determining: (1) whether the transactions resulted in the sale of a capital asset within the meaning of Section 117, Internal Revenue Code 1939, as amended, 26 U.S.C.A. § 117, or a mere license for the same; and (2) if a sale, whether the asset was held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business within the meaning of Section 117(1). Some background facts will be helpful to a proper understanding of the transaction on which taxability turns.
 
 
 2
 One McCullough acquired from the patentee the exclusive right and license to use, manufacture, sell and distribute a patented freezing and dispensing machine (later known as the Dairy Queen machine) in certain designated states, including "the right and privilege of granting sublicenses to others." In addition to a lump sum payment, McCullough agreed to pay the patentee 4¢ per gallon on all of the product of the machines sold within the exclusive territory, so long as the machines were used, irrespective of the life of the patent. He was to furnish the mix for the product, which he registered under the trade name "Dairy Queen".
 
 
 3
 Thereafter, McCullough, doing business as "McCullough's Dairy Queen", entered into a contract with taxpayer, Copelin, which first recited that McCullough was "possessed of a certain formula together with the production methods and machinery requirements for the preparation, sale and distribution of a certain product known as Dairy Queen * * *." The contract then granted to Copelin "the sole and exclusive right and franchise for the manufacture, preparation and distribution of Dairy Queen within the State of Oklahoma" in consideration of a lump sum payment and 4¢ per gallon on all the product sold within the State of Oklahoma. In addition, Copelin agreed to purchase the patented machines used in his territory directly from the manufacturer and to pay therefor the sum of $1,600 for each machine, and such machines were not to be moved or used outside of the State of Oklahoma. It was agreed that the Dairy Queen product was a registered trade name in the State of Oklahoma, and that Copelin would endeavor to introduce Dairy Queen to the public and develop the franchise at his expense; and that he would sell not less than 5,000 gallons of the product each season.
 
 
 4
 Later, Copelin formed a partnership with taxpayers L. H. and Priscilla Nehring, and the partners entered into an agreement to form the taxpayer-corporation for the "promotion of the Dairy Queen business within the State of Oklahoma". The taxpayer-corporation (Dairy Queen of Oklahoma, Inc.) was then organized and all of the partnership assets, including its operating Dairy Queen stores, were transferred to it. Thereafter, and in the taxable years 1948 and 1949, the taxpayer-corporation entered into nineteen and seventeen agreements, respectively, designated "Dairy Queen Franchise Agreement". Each agreement referred to the parties as "Company" and "licensee", and recited that the Company was the holder and owner of an exclusive franchise for the preparation, sale and distribution of Dairy Queen in the State of Oklahoma; and had agreed to grant to the licensee an exclusive territory within the State of Oklahoma for the preparation, sale and distribution of this product. The Company agreed to "furnish for the use of the licensee" within the designated territory two Dairy Queen freezers at the sole cost and expense of the Company, said freezers to "remain the property of the Company". The Company agreed to supervise the installation of the machines, be responsible for production, furnish the Dairy Queen formula, assist in obtaining a source of supply which must be approved by it, train key personnel, and otherwise assist in opening the first store. The licensee agreed to furnish a suitable location to be approved by the Company; the store was to be of standard design and construction and the licensees agreed to maintain standards of quality with respect to cones, cups, flavorings and miscellaneous supplies, and to dispense no other product than Dairy Queen from the store. In the event of the violation of any of the terms of the contract, the Company was given the right to enter and remove its machines free and clear of any damages for trespass. The licensee agreed to pay the sum of $1,875 upon delivery of each machine, and in addition 35¢ for each gallon of mix processed in the machines.
 
 
 5
 During the taxable year 1948, petitioner corporation received $57,056.45 as lump sum payments provided for in the franchise agreement, and $30,434.73, representing the 35¢ per gallon royalty. In its income tax return for that year, the corporation reported the gallonage royalty as ordinary income. The lump sum payments were returned as long term capital gains after deducting the sum of $18,324.30 paid to McCullough in that year as consideration for the franchise. The Commissioner did not disturb the amounts returned as ordinary income, but determined that the aggregate amount of the lump sum payments also represented ordinary income without cost or other basis and assessed a deficiency accordingly. For the taxable year 1949, the petitioner again returned the royalty payments as ordinary income and the lump sum payments as capital gains. The Commissioner again refused to treat the lump sum payments as capital gains.
 
 
 6
 During the taxable year 1949, the petitioner corporation operated two stores where it sold Dairy Queen products, and it is agreed for purposes of determining personal holding company income of the corporation for the year 1949 that the gross profits from the sales of these two stores was $18,648.58. Having determined that more than 80 percent of petitioner's 1948 income was personal holding company income, and the corporation not having made any distribution thereof, it was held to be a personal holding company during that year, and deficiencies were assessed accordingly.
 
 
 7
 Affirming the Commissioner, 26 T.C. 61, the Tax Court very properly recognized the indecisiveness of the use of the words "licensee" and "royalty" to describe the substance of the transaction between the parties for tax purposes. Looking at the content of the contract, the court also recognized some of the elements of a sale, such as the grant of the right to use the freezer and sell its product in an exclusive territory. But the court reasoned that the consideration to the taxpayer was for a "single bundle of rights", namely, exclusive territory, trade name, formula and freezer — all necessary for the successful operation of a Dairy Queen store. Viewed in this manner and in the light of the conditions and limitations imposed upon the exercise of the granted rights, the Court could not say that the taxpayer had sold his bundle of rights to the purchaser of the franchise and therefore held that the thirty-six franchise agreements were mere licensing agreements, the consideration for which (both lump sum and gallonage payments) represented royalties payable as ordinary income.
 
 
 8
 From the logic employed and the authorities cited, the Court seems to rely upon the doctrine of indivisibility, usually applicable in cases like this to contracts involving patents and copyrights. Under this accepted principle, a contract conveying the exclusive right to make, use and vend an invention or an undivided part or share of that exclusive right in the United States or within a specified area, constitutes an assignment of the patent, complete or partial as the case may be, and any transfer short of that is not an assignment but a license. Watson v. United States, 10 Cir., 222 F.2d 689; Broderick v. Neale, 10 Cir., 201 F. 2d 621; Cleveland Graphite Bronze Co. v. Commissioner, 10 T.C. 974; Federal Laboratories, Inc. v. Commissioner, 8 T. C. 1150; Cory v. Commissioner, 2 Cir., 230 F.2d 941. But see also Goldsmith v. Commissioner, 2 Cir., 143 F.2d 466, and Frankfurter dissenting in Commissioner v. Wodehouse, 337 U.S. 369, 401, 69 S. Ct. 1120, 93 L.Ed. 1419; Fulda, Copyrights Assignments and Capital Gains Tax, 58 Yale Law Rev. 245.
 
 
 9
 We agree with the Tax Court that the taxpayer assayed to convey only a single bundle of rights, and that the use of the patent was only one of the sticks in that bundle. Indeed, the franchise agreement did not purport to convey the exclusive right to make, use and vend the patent. But we do not think that conveyance of the whole or an undivided part of the patent is essential to the valid sale of a property right or capital asset which included, as an integral part thereof, only the right to use the patent. Instead, the franchise agreement purported to convey the exclusive and perpetual right to make and sell a trade-marked product within a designated territory. That right was undoubtedly a property right, one subject to sale as such — a capital asset, if you please. And, it was none the less so because it involved the beneficial use, but not the right to make and sell the patent. See Lawrence v. United States, 5 Cir., 242 F.2d 542.
 
 
 10
 Of course if the conditions and restrictions upon the exercise of the granted right were such as to reserve in the grantor the proprietary right in the franchise, the grant would be something less than a sale and probably a mere license. But the traditional test of ownership is the power to exclude others. Taxation is not concerned with refinements of title, but with actual command of the property. See Corliss v. Bowers, 281 U. S. 376, 50 S.Ct. 336, 74 L.Ed. 916; Griffiths v. Helvering, Commissioner, 308 U.S. 355, 60 S.Ct. 277, 84 L.Ed. 319.
 
 
 11
 The requirements of the franchise with respect to maintenance of quality; sanitary dispensing conditions; design of stores; right to audit the books; approve source of "mix"; and cancellation for violation of such requirements, were all intended to insure uniform standards for the trade name product sold state-wide. So long as the grantee complied with these conditions subsequent, the grantor could not invade the grantee's exclusive right to make and sell the products in his designated territory. Each and all of these conditions were designed to protect and safeguard the respective rights of the parties. They were not intended to reserve to the grantor any property or proprietary right in the exclusive and perpetual franchise. Nor do we think the provisions with respect to the gallonage payments impair such exclusive right. Cf. Watson v. United States, supra.
 
 
 12
 We conclude that the transactions amounted to a sale of a capital asset, and the question remains whether the sales were made in the course of trade or business. The Tax Court did not reach that question, and the case is reversed and remanded for its determination in the first instance.
 
 
 13
 LEWIS, Circuit Judge (dissenting).
 
 
 14
 It seems to me the agreement here considered falls far short of an instrument of sale of a capital asset and constitutes, as the phraseology of the parties indicated to be their intent, a licensing agreement for the marketing of a trademarked article under the strict supervision of the licensor. A franchise cannot be separated from the subject matter of the franchise and if the control of the subject matter, here a dairy product, is retained from manufacture to sale it seems clear that no sale of the franchise itself has been intended or has occurred. The taxpayer seems to have recognized this by his voluntary assessment of his "royalty income" as ordinary income.
 
 
 15
 In mentioning the provisions of limitation upon the rights granted under the agreement to the grantee, the main opinion dismisses each as a condition subsequent to a contract of sale. I cannot so interpret the contract as each such provision indicates the desire of the grantor to retain control of the product Dairy Queen for the purpose of protecting his franchise and its value. In the Watson[1] case we held that the power to terminate an agreement for failure to produce and sell did not negative a sale because it did "not detract from the effectiveness of the agreement." The provision in Watson merely assured payment of intended though deferred consideration but did not control the product. The conditions here do. Title to the Dairy Queen machine is retained by the licensor; control is retained over the physical appearance of the outlet; control is retained over the source of the licensee's dairy supplies, its mix, its operational standards as to quality and cleanliness. The agreement seems to assign but operational function pertaining to the product Dairy Queen and not to assign a franchise. I would, as did the tax court, interpret the parties' agreement as a grant of a license. Broderick v. Neale, 10 Cir., 201 F.2d 621; Watson v. United States, supra.
 
 
 
 Notes:
 
 
 [1]
 Watson v. United States, 10 Cir., 222 F.2d 689, 691