**C. A. NORGREN CO.**, a corporation organized and existing under the laws of the State of Colorado, Plaintiff,

v.

**UNITED STATES of America, Defendant.**

Civ. A. No. 63–C–79.

United States District Court
D. Colorado.

May 3, 1967.

Milton E. Meyer, Jr., and Arnold C. Wegher, Denver, Colo., for plaintiff.

Lawrence M. Henry, U. S. Atty., Milton C. Branch, Asst. U. S. Atty., Denver, Colo., and Kenneth L. MacCardle, Trial Atty., U. S., Dept. of Justice, Washington, D. C., for defendant.

### MEMORANDUM OPINION AND ORDER

ARRAJ, Chief Judge.

Plaintiff taxpayer, C. A. Norgren Co., has moved for a partial summary judgment, as to its claim that it is entitled to a refund because the proceeds from certain patent transfers should have been taxed at the long term capital gain

rather than ordinary income rate. The three tax years in question are plaintiff's fiscal years 1961, 1962 and 1963.

The amounts which are the subject of the present motion were received by taxpayer pursuant to a patent right transfer agreement entered into in 1949 with Shipston Engineering Co., Ltd., a British concern. Reduced to its simplest denominator, taxpayer's claim is that the agreement effected a "sale" or "assignment" of patent rights, thus constituting the sale of a capital asset or § 1231 asset, entitling the taxpayer to capital gains treatment on the proceeds. (It is probable that a patent right, because it is depreciable, would have to be considered a § 1231 asset, but the distinction is not relevant here. See 3B Mertens, Law of Federal Income Taxation § 22.133 (1966).) The Government's primary contention is that taxpayer had merely a "licensing" agreement with Shipston and that the proceeds received were "royalties", taxable as ordinary income. Other contentions of the Government will be dealt with later in this opinion.

The following is only a brief sketch of the rather complex factual situation which has been presented to the Court. Taxpayer is a Colorado corporation engaged in the business of manufacturing and selling various pneumatic and hydraulic devices. Prior to 1949 taxpayer's sales abroad were effected by exporting, but in 1949 taxpayer determined that it would be to its economic advantage to permit a British company to manufacture and sell the Norgren line of products. In aid of this determination taxpayer negotiated with Mr. Philip Symons of Shipston Engineering Co., Ltd., of England, and on July 1, 1949 a contract was entered into between taxpayer and Shipston. The contract purported to vest in Shipston the "exclusive right and license to manufacture and sell" all Norgren devices, which right was confined to "Great Britain, Eire, the British Empire (excluding Canada and the Indian Peninsula), France, Italy, Spain, and Portugal". The rights of Shipston were made "subject to the right of Licensor [plaintiff] to grant to third parties nonexclusive rights to sell in said countries any and all Norgren devices if and when the same are sold attached to and as appurtenances of or as spare or replacement parts for any machines manufactured in the territory assigned to such third parties".

The consideration running from Shipston to taxpayer was to consist of a "royalty" of 2½% of the net sales price of all Norgren products manufactured by Shipston. The contract also referred to an English company, C. A. Norgren, Ltd., and noted that Shipston had an agreement with that company which designated it as the exclusive sales agent of Shipston for Norgren devices. The taxpayer-Shipston contract then went on to provide that Shipston could not terminate or alter its sales agreement with C. A. Norgren, *Ltd.*, without the written approval of taxpayer, C. A. Norgren, *Co.*

On that same date, July 1, 1949, Shipston executed an agreement with the newly-formed C. A. Norgren, Ltd., designating it as the sole agent for the purpose of selling Norgren devices. C. A. Norgren, Ltd., was to receive the products from Shipston at factory costs plus a profit of 15%. The ownership of C. A. Norgren, Ltd., resides primarily with the Symons family, who have the controlling interest in Shipston as well, however Carl A. Norgren and members of his family acquired a 34% stock ownership of C. A. Norgren, Ltd.

■ It is well settled that the yardstick for determining whether a transfer of patent rights constitutes an "assignment", so as to entitle the transferor to capital gains treatment, as opposed to a mere "license", is whether the transferor has parted with "all substantial rights" under the patents. See, e. g., 3B Mertens, supra at § 22.133; cf., Title 26 U.S.C. § 1235. (§ 1235 does not apply to corporate taxpayers such as plaintiff here, but it is still an instructive and persuasive provision in this context.)

It has frequently been said that the best method of ascertaining what has or has not been transferred is to examine

what rights have been *retained* by the grantor. See, e. g., Allied Chemical Corp. v. United States, 370 F.2d 697 (2d Cir. 1967). It is the Government's position that the taxpayer in this case retained several significant attributes of ownership which militate against a finding that there was a true assignment of all substantial rights.

▆▆ Before cataloging these rights which were purportedly retained by the taxpayer, we should point out that the nomenclature employed by the parties to the patent agreement is in no sense determinative of the legal characterization to be placed upon the transaction. For example, the fact that the agreement was labeled a "license" and the payments incident to it were referred to as "royalties" does not preclude a finding that an effective "assignment" took place for tax purposes. Dairy Queen of Oklahoma, Inc. v. Commissioner, 250 F.2d 503 (10th Cir. 1957); Watson v. United States, 222 F.2d 689 (10th Cir. 1955). The critical question is still whether all substantial rights were in fact transferred.

The following are rights which the Government contends were retained by the taxpayer:

1) By transferring only the rights to "manufacture and sell" the devices, the plaintiff impliedly retained the right to *use*, or permit others to use, the devices within Shipston's territory;

2) Plaintiff expressly reserved the right to grant nonexclusive selling rights to third parties within Shipston's territory, as to Norgren devices which are attached to and appurtenances of or as spare or replacement parts for any machines manufactured in the territory assigned to the third parties;

3) The transferee, Shipston, actually received only the right to manufacture the devices at a 15% profit, less the royalties to be paid to plaintiff;

4) Plaintiff retained the right to prevent Shipston from altering its exclusive sales agreement with C. A. Norgren, Ltd.;

5) Plaintiff restricted the transferee's right to sublicense.

Each of these purported reservations will be separately considered.

1). It is true that the 1949 agreement stated that the transferee would receive the rights "to manufacture and sell" the Norgren devices, and no explicit reference was made to a transfer of the "use" of the devices. In a few cases concerned with the instant question, the courts have indicated that a conveyance of all substantial rights to a patent would have to include the exclusive rights to make, use and vend the invention, which are considered the primary attributes of a patent according to patent law. See, e. g., Redler Conveyor Co. v. Commissioner, 303 F.2d 567 (1st Cir. 1962); cf., Waterman v. MacKenzie, 138 U.S. 252, 11 S.Ct. 334, 34 L.Ed. 923 (1891).

▆ In the most recent decisions, however, the Courts have taken the view that even if the use of the patented device is not transferred, the transaction can still be viewed as an assignment for tax purposes provided that "rights amounting to full and complete control" have been relinquished. 3B Mertens, supra § 22.133 at p. 802. In other words, the use of the devices can in some cases be viewed as an insubstantial right. Rollman v. Commissioner, 244 F.2d 634 (4th Cir. 1957); First Nat'l T. & S. Bank of San Diego v. United States, 200 F.Supp. 274 (S.D.Calif.1961); Flanders v. United States, 172 F.Supp. 935 (N.D. Calif.1959); Estate of Gowdey v. Commissioner, 307 F.2d 816 (4th Cir. 1962); Gruber v. United States, 158 F.Supp. 510 (D.C.Or.1958), rev'd on other grounds, sub nom. Mayer v. United States, 285 F.2d 683 (9th Cir. 1960).

The following policy statement by the Senate Finance Committee, quoted in F. H. Philbrick, 27 T.C. 346, 356 (1956), indicates a legislative approval of this approach:

[T]he courts have recognized that an exclusive license agreement in some instances may constitute a sale for tax purposes even where the right to

"use" the invention has not been conveyed to the licensee, if it is shown that such a failure did not represent the retention of a substantial right under the patent by the licensor. It is the intention of your committee to continue this realistic test, whereby the entire transaction, regardless of formalities, should be examined in its factual context to determine whether or not substantially all rights of the owner in the patent property have been released to the transferee, rather than recognizing less relevant verbal touchstones.

Plaintiff contends that in spite of the verbal omission in the 1949 agreement Shipston *has* received the right to use the Norgren devices, see deposition of Carl A. Norgren, p. 108. Plaintiff points out that Shipston does use the devices in connection with its sanding machines. The United States Supreme Court decision in Adams v. Burke, 17 Wall. 453, 84 U.S. 453, 21 L.Ed. 700 (1873) is also pointed to by plaintiff, as authority for the proposition that the transfer of a patent *automatically* vests in the transferee the right to use the patented device.

■ In any event, it appears to the Court that with the rights of manufacture and sale conveyed, a retained right by the taxpayer to "use" its patented devices in Shipston's limited territory would be of minimal, if indeed any, value. We conclude that the failure of the agreement specifically to grant the right to use the devices did not constitute the retention of a substantial right by the taxpayer.

2). The Government urges that the following reservation in the 1949 agreement constitutes the retention of a substantial right. The territorial transfer was made "subject to the right of the Licensor to grant to third parties nonexclusive rights to sell in said countries any and all Norgren devices if and when the same are sold attached to and as appurtenances of or as spare or replacement parts for any machines manufac-

tured in the territory assigned to such third parties".

■ As plaintiff notes, the agreement goes on to provide that Shipston was to receive a reciprocal nonexclusive right to sell Norgren devices outside of its territory, when such devices were attached to or replacement parts of its machines. We agree with plaintiff that these provisions simply reflect a reality of economic life: Once a person properly acquires a patented product, his subsequent use of it cannot be restricted. The patent monopoly does not circumscribe such usage. Cf., Adams v. Burke, supra. One who purchases Norgren devices in the United States, for example, and incorporates them into his machine could not be prevented by Shipston from selling his machine in Great Britain. It may well be that this provision in the agreement has absolutely no effect and is mere surplusage. But in any event, the Court is unable to comprehend how the provision reserved to the grantor any substantial right. We conclude that it did not.

3). The Government contends that in actuality Shipston received nothing more from plaintiff than the right to manufacture Norgren devices at a 15% profit, less the "royalty" of 2½% (later changed to 3½%) to be paid to plaintiff. This contention is based on the fact that on the same day that the Shipston-taxpayer agreement was executed the exclusive sales agreement between Shipston and C. A. Norgren, Ltd., was entered into.

■ At the outset it must be reiterated that the question is not what rights Shipston *received*, but what rights were *relinquished* by the taxpayer. Thus the fact that the transferor contemporaneously assigned patent rights to two companies, one receiving the right to sell and the other the right to manufacture and use, would make no difference. Armco Steel Corp. v. United States, 263 F.Supp. 749 (S.D.Ohio 1966). The transferor has still parted with all substantial rights to the patent.

In order for the Government to convince us that the taxpayer retained a

substantial right in this respect they would have to establish that the exclusive sales right never left the taxpayer, or in other words that the bundle of sticks conveyed to Shipston actually contained a few boomerangs which immediately found their way back to the taxpayer. It is suggested that the company which received the selling right, C. A. Norgren, Ltd., is actually controlled by, or the alter ego of, the plaintiff. It is clear to the Court, however, that if C. A. Norgren, Ltd., can be said to be the alter ego of any entity it would be that of Shipston, the transferee. The Government has not seriously questioned the fact that the control of Norgren, Ltd., is in the hands of the Symons family of Shipston. However, the Government does attempt to capitalize on the fact that Carl A. Norgren and other members of his family acquired a minority stock interest (approximately 34%) in Norgren, Ltd.

The purpose of the Norgrens' wishing to obtain shares in the sales company is obvious. The stock ownership, like the "royalty" payment based on sales, enabled them to profit from the foreign economic exploitation of Norgren devices. There is nothing sinister or evasive about this motive, and if all substantial rights to the patents have otherwise been transferred, the transaction will still be viewed as an assignment. The fair market value of the shares is simply another form of consideration received for the assignment. The fact remains that plaintiff parted with the exclusive right to sell in the Shipston territory. Whether the transferee of that right had on its Shipston or C. A. Norgren, Ltd., hat is simply not material.

4). We are similarly unpersuaded by the Government's contention that plaintiff retained a substantial right by providing in the 1949 agreement that Shipston could not alter its exclusive sales agreement with C. A. Norgren, Ltd., without plaintiff's permission. Plaintiff states that the purpose of this provision was to ensure that Norgren devices would be sold under the Norgren name in the transferee's territory. The Government attempts to discredit that statement by arguing that in 1949 Norgren was still a small concern, whose name had no significance in international industry. This was certainly not the feeling of the parties to the agreement, which recites that the Norgren trademark "has gained acceptance as a symbol of quality in the industrial world".

■■ Also, the prefatory sentence of the paragraph in the agreement alluding to C. A. Norgren, Ltd., reveals the purpose of that company's being formed: "In the opinion of the parties, it is desirable that the Norgren devices be sold under the name of Norgren." Plaintiff apparently felt that if the products were sold under the Norgren name this would protect its right to receive a good payment in "royalties". It is quite clear that provisions merely "safeguarding the financial interest of the patentee in respect to continued payment of royalties" are not inconsistent with capital gain treatment. Watson v. United States, 222 F.2d 689, 692 (10th Cir. 1955). This provision did not detract from or impair the proprietary interest in the patents which was transferred by the taxpayer and was not the reservation of a substantial right.

■ 5). The 1949 agreement itself places no restriction on the transferee as to sublicensing, but the Government is quite correct in contending that where the terms of the agreement do not comport with the actual conduct of the parties the Court should examine all of the surrounding circumstances. If the taxpayer actually restricted the transferee's right to sublicense, that factor would have to be taken into consideration in determining whether substantial rights have been conveyed.

Exhibits J, K and L of the Government are correspondence concerning a prospective sublicensing agreement between Shipston and C. A. Norgren, Ltd., and a French concern, Outils Pneumatic Globe. (France is within Shipston's exclusive territory.) These exhibits in-

dicate that plaintiff thought that it still had a definite say as to the terms of any sublicensing by Shipston. A mere mistaken interpretation of the legal effect of the agreement does not, of course, mean that plaintiff did in fact have the right to restrict sublicensing. The ultimate agreement with the French concern was certainly executed solely by Shipston, C. A. Norgren, Ltd., and Outils Pneumatic Globe, without any interference or participation by plaintiff.

Even if we assume that plaintiff did in fact restrict Shipston's right to sublicense, there is considerable authority holding that such a restriction does not necessarily constitute the reservation of a substantial right under the patents. For example, in Rollman v. Commissioner, 244 F.2d 634, 640 (4th Cir. 1957), the court stated the following with respect to a sublicensing restriction:

> Such a limitation does not interfere with the full use of the patent by the assignee and it serves to protect both parties to the assignment in case the purchase price is paid in instalments. Moreover, the assignor retains no use of the patent for himself by reason of the limitation since he has granted the exclusive rights to the assignee and cannot grant a sub-license without the purchaser's consent. (Citing cases, including Watson v. United States, supra.)

In Watson the Court of Appeals of the Tenth Circuit concluded that the sublicensing limitation "was intended to protect the rights of the parties under the contract, not to proscribe, limit, or nullify their intent and purpose to vest immediately in the transferee the right to manufacture, sell, and use the carts throughout the life of the patent * *." Id., 222 F.2d at p. 691. See also, Wing v. Commissioner, 278 F.2d 656 (8th Cir. 1960).

■ We feel that in the instant case the mutual interests of both parties were protected by such a provision, for both have a firm interest in ensuring that the quality of Norgren devices be maintained at a high level by any and all who manufacture them. Even if there were a limitation on sublicensing, it would not detract from the rights inherent in the patent itself and would not be the retention of a substantial right.

The Government also claims that plaintiff has invaded Shipston's exclusive territory on at least one occasion by transferring exclusive territorial rights to an Indian concern, Shavo Norgren. It is the Government's position that such an "invasion" indicates that the arrangement between plaintiff and Shipston was actually something other than that evinced by the 1949 written agreement.

The Government's exhibits which purportedly reveal such an invasion are in fact proof that the very temporary invasion was purely accidental and unintended. The Exhibits are those lettered R, S and T. Actually, the only conflict was in the granting to the Indian company of rights in the Federation of Malaya, which would have been encompassed in the 1949 transfer to Shipston, as a portion of the then British Empire. The exhibits disclose that when plaintiff recognized the possible conflict it immediately sought to resolve it. Part of Exhibit R is a 1965 agreement with the Indian company *excluding* the Federation of Malaya from its territory.

■ We conclude that none of the alleged conditions or restrictions enumerated by the Government was "intended to reserve to the grantor any property or proprietary right", Dairy Queen of Oklahoma, Inc. v. Commissioner, supra 250 F.2d at 506, and that the plaintiff relinquished all substantial rights to the patented devices within the territory covered by the transfer. Therefore, there was a valid assignment of the patent rights. The Government has various other contentions which will now be discussed.

It is argued that even if the Court were to conclude that the Shipston transaction constituted an "assignment" of the patent rights, the proceeds of the

824

assignment would still be taxable at ordinary income rates because the patent rights were not capital gain assets but "property held for sale to customers in the ordinary course of taxpayer's trade or business". Title 26 U.S.C. § 1221(1). We do not agree. The Government concedes that "conceptual difficulties are encountered in determining how foreign patent rights were used in the taxpayer's trade or business". We acknowledge the conceptual difficulties and feel that to arrive at the conclusion urged by the Government we would have to engage in some rather deft juggling of facts and definitions.

It has been pointed out that the principal question in this context is whether the taxpayer is in the trade or business of inventing and selling patents. Annot., 46 A.L.R.2d 615, 738 (1956). We do not hesitate in concluding that C. A. Norgren Co. is *not* engaged in such a business. Most of taxpayer's patents are retained by it, and when rights are disposed of, as in the present case, the transfer is geographically limited and designed for commercial exploitation from which the transferor will profit. This fact strongly dictates against the assertion that the patents were held primarily for sale to customers in the ordinary course of business. 46 A.L.R. 2d, supra at 741–742. (However, the mere fact that the profit is tied to and dependent upon the success of the transferee's exploitation does not compel a conclusion that substantial rights were not transferred. Dairy Queen of Oklahoma, Inc., v. Commissioner, supra.)

The infrequency of such sales, the small number of "customers", and the type of consideration (a "royalty" percentage of the transferee's sales) all lend support to our conclusion: The patents were *not* held primarily for sale to customers in the ordinary course of business. Beach v. Shaughnessy, 126 F. Supp. 771 (D.C.N.Y.1954); 46 A.L.R. 2d, supra. It might also be mentioned that in the language of the statute, "property held *primarily* for sale", the word "primarily" means "of first im-

portance" or "principally". Malat v. Riddell, 383 U.S. 569, 86 S.Ct. 1030, 16 L.Ed.2d 102 (1966); Armco Steel Corp. v. United States, supra.

The Government has also suggested that the relationship between plaintiff and Shipston is analogous to that of an employee and employer. Thus it is their contention that proceeds received by plaintiff constitute compensation for services rendered and hence ordinary income.

The facts clearly demonstrate that C. A. Norgren Co. is not "one who is hired to invent" for Shipston. Shipston is merely a territorial assignee of patent rights of the plaintiff, and plaintiff, a substantial and world renowned manufacturer, is by no means Shipston's employee.

A much weightier problem is posed by the Government's assertion that at least *part* of the consideration received pursuant to the 1949 agreement with Shipston must be attributed to services rendered by plaintiff, which consideration would be taxable as ordinary income. Ruge v. Commissioner, 26 T.C. 138 (1956); Kimble Glass Co. v. Commissioner, 9 T.C. 183 (1947). It is only this question which we agree cannot be resolved at this juncture and which must await a further and more complete presentation of facts. Certainly several of the obligations undertaken by plaintiff might be classified as services, e. g., the schooling in Denver of Shipston representatives on the manufacture and use of the Norgren devices.

The increase of the royalty rate from 2½% to 3½%, the Government argues, was based on a recognition of the value of plaintiff's services. Plaintiff denies this claim, and a genuine issue is thus presented.

We are familiar with the decisions holding that a transfer of "know-how" can be considered as being merely ancillary to the assignment of the patent rights and therefore still taxable at capital gain rates. For example, Heil Co. v. Commissioner, 38 T.C. 989 (1962).

However, compensation *for what is a* separate *service* to be rendered is still taxable at ordinary income rates. We therefore reserve until the time of trial a determination as to what portion of the "royalties" should be allocated to the sale of patent rights and what portion to the rendering of services.

Although the Government repeatedly urges that there are numerous issues of fact which cannot be resolved upon a summary judgment motion, they have not really presented any, other than the one concerning allocation. We have not confined our consideration to the written agreement of 1949, but have also analyzed the depositions and numerous exhibits which are in the file. It is on the basis of all of this material that we arrive at our holding. For the present we hold only that the transaction between plaintiff and Shipston resulted in an *assignment* of a capital gain or § 1231 asset, rather than a mere license. It is therefore

Ordered that plaintiff's motion for a partial summary judgment be, and hereby is, granted as to the issue of whether the 1949 agreement between plaintiff and Shipston Engineering Co., Ltd., effected an assignment of a capital gain or § 1231 asset, or merely a license.