**SYNCSORT INCORPORATED,
et al., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

**Nos. 435–89T, 560–89T, and 561–89T.**

United States Court of Federal Claims.

June 24, 1994.

I. Frederick Shotkin, New York City, for plaintiffs.

Scott W. Putney, Terry T. Coles, and Mildred L. Seidman, with whom was Asst. Atty. Gen. Loretta C. Argrett, Washington, DC, for defendant.

*OPINION*

ANDEWELT, Judge.

In these consolidated tax refund actions, plaintiffs, Syncsort Incorporated (Syncsort) and Assadour O. Tavitian (individually and as "Tax Matters Person" of Syncsort), seek to

recover income taxes paid for tax years 1979 through 1985 on payments Syncsort received pursuant to licensing agreements it entered with four foreign computer consulting firms. Plaintiffs contend that the Internal Revenue Service (IRS) improperly required plaintiffs to treat these payments as ordinary income for federal income tax purposes instead of permitting the more beneficial tax treatment available for capital gains. These actions are presently before the court on cross-motions for summary judgment. For the reasons set forth below, defendant's motion for summary judgment is granted and plaintiffs' cross-motion is denied.

## I.

The material facts are not in dispute. During tax years 1979 through 1985, Syncsort principally was engaged in the business of marketing and leasing or licensing a computer program referred to as "SyncSort" (the Sort Program). The basic function of the Sort Program was to sort unorganized individual data records in a specified sequence, *e.g.,* in alphabetical or chronological order. In the domestic market, Syncsort offered its customers a computer tape of the Sort Program plus support services. The support services included installing the Sort Program, training a customer's systems programmers to use the Sort Program, fine-tuning the parameters of the Sort Program to the boundaries of the customer's computer environment, and maintaining the Sort Program by correcting any defects or "bugs" or by referring the customer to the pertinent portions of the operation manuals and/or user guides. In addition, separate from fine-tuning the parameters of the Sort Program, Syncsort apparently also engaged in certain "customized actions" which involved the customer's individual computer system. Using confidential information about the Sort Program, Syncsort modified the customer's systems software so as to enable the customer to secure greater efficiencies in the sorting process carried out by the Sort Program. (*See infra* note 3.)

Four foreign computer consulting firms contacted Syncsort and expressed an interest in Syncsort's business. After determining not to exploit the relevant foreign markets on its own, Syncsort entered licensing agreements with these four firms, Pandata NV (Pandata), The Shell Company of Australia Limited (Shell), Computing Benefits (Proprietary) Limited (Computing Benefits), and Software Engineering Co., Ltd. (Software Engineering). In the respective agreements, Syncsort granted each of the four licensees, *inter alia,* an exclusive license in a specified geographic area to promote, advertise, duplicate, use, sublicense, and sublease the Sort Program, and to use the associated Syncsort trademarks.[1] The licensing agreements also provided for the transfer to the licensees of "Trade Secrets" and "Licensed Technology," which apparently correspond to the confidential information Syncsort used in providing the Sort Program and related services to its domestic customers.[2] The "Licensed Technology" consisted of technological information and marketing data including charts and diagrams relating to the Sort Program's "object code," a master tape of the "object code," sales promotion information, advertising material, contracts, and brochures. The

1. The Computing Benefits licensing agreement is unique in that it also permitted Computing Benefits to sell the Sort Program.

2. "Trade Secrets" and "Licensed Technology" are defined in a generally consistent manner in the licensing agreements with Pandata, Computing Benefits, and Shell. For example, the Pandata agreement defines the terms, in pertinent part, as follows:

(b) The term "Licensed Technology" shall mean (i) technical information, charts and diagrams relating to, and a master tape of the "object code" of, each version of the [Sort Program] in sufficient detail to enable [the licensee] (x) to make duplicate copies of [the Sort Program], (y) to install [the Sort Program]

for, and deliver the same to, its customers, and (z) to service the same, and (ii) marketing data, such as sales promotion and advertising material, contracts and brochures used by [Syncsort] in marketing the [Sort Program].

(c) The term "Trade Secret" shall mean the compilation or partial compilation of information relating to the Licensed Technology which will be disclosed to the licensee....

The Software Engineering licensing agreement varies slightly from the other three agreements in that instead of defining the two separate terms, it defines only "Trade Secrets," which apparently combines the two definitions contained in the other three agreements.

"Trade Secrets" consisted of confidential information about the Sort Program necessary to enable the licensees to "customize" their customers' systems software so as to permit the Sort Program to operate most efficiently.[3]

In the respective licensing agreements, plaintiffs granted exclusive marketing rights to Pandata in the Soviet Union, the Middle East, North Africa, Southwest Asia, and various European countries; to Shell in Australia and New Zealand; to Computing Benefits in South Africa; and to Software Engineering in Japan and Korea. Each of the licensees agreed to use its best efforts to market the Sort Program within its exclusive territory. As consideration for the license, rights, and disclosures made by Syncsort under the licensing agreements, each licensee agreed to pay Syncsort a fixed royalty ranging from 25 to 50 percent of the gross revenues the licensee earned from "marketing" the Sort Program, including revenues received for maintaining the Sort Program.[4] In the Pandata agreement, Pandata also agreed to pay Syncsort $200,000 in addition to the fixed royalty.

For each of the tax years in issue, Syncsort recorded the payments it received from these licensees on its Schedule D tax form under Part II, entitled "Long–Term Capital Gains and Losses—Assets Held More Than One Year." From 1979 through 1984, Syncsort described the income source under Part II as "Sale of Franchises." For 1985, Syncsort changed the description to "Sale of Know How." The IRS first disputed plaintiffs' classification of the income received under the licenses for tax years 1979 through 1983. The IRS alleged that plaintiffs should have treated the payments as ordinary income instead of capital gains. Syncsort paid the additional funds sought by the IRS for these tax years and then filed a refund claim. After the IRS denied Syncsort's refund request, Syncsort filed two separate suits in this court seeking a refund for tax years 1979 through 1982, and 1983, respectively. Thereafter, for tax years 1984 and 1985, the IRS, on the same grounds as for tax years 1979 through 1983, assessed additional taxes against plaintiff Assadour O. Tavitian, both as "Tax Matters Person" of Syncsort and in his individual capacity. After Syncsort's shareholders paid these additional assessments, Syncsort and Tavitian filed a third suit seeking a refund for tax years 1984 and 1985. This court consolidated the three actions.

**3.** Plaintiffs' affidavits provide the following explanation of the efficiencies that can be achieved by taking such "customized actions." Before the Sort Program installed on a customer's computer system begins the sorting process, it interacts with the system's "invoking program," a separate software package that provides the Sort Program with certain information about the computer system, e.g., the information that is to be sorted or the system's capabilities. Because many "invoking programs" were written at an earlier time when computer knowledge was significantly less sophisticated, these programs often communicate with the Sort Program in a static rather than a dynamic manner. For example, if at the time an "invoking program" was written, a computer system had available 200,000 bytes of memory for the sorting process, the "invoking program" would include that fixed number. Thus, if the computer system were later upgraded, and now had available 400,000 bytes of memory for the sorting process, the "invoking program" would continue to reflect only 200,000 bytes of available memory. Hence, when communicating with the Sort Program, the "invoking program" would fail to relate the additional 200,000 bytes of memory now available and the Sort Program would run only half as efficiently as it potentially could. Because changing the coding of the "invoking program" is difficult and often impossible, Syncsort proposed creating an "interface" program to work along with the "invoking program." This "interface" program would essentially "fake" the Sort Program into reading 400,000 bytes of available memory instead of 200,000 bytes. Therefore, while the "invoking program" would continue to communicate to the Sort Program 200,000 bytes of available memory, the Sort Program would react as though it read a value of 400,000 bytes and thereby would take advantage of potential efficiencies. In order to create such an "interface" program, however, the installer of the Sort Program must have an intimate knowledge of certain aspects of the Sort Program, i.e., information contained in the "Trade Secrets."

**4.** The language of the Software Engineering agreement differs from the other three agreements but not in any material way. The royalty payments in the Software Engineering agreement were based upon the gross revenues from licensing and maintaining the Sort Program, and "Trade Secrets" were disclosed thereunder to enable Software Engineering "to license, maintain, and support the [Sort Program]."

In its motion for summary judgment, defendant contends that each of the four licenses in issue constitutes a transfer of a franchise and that pursuant to 26 U.S.C. § 1253, all money received from such transfers must be treated as ordinary income for federal income tax purposes. In their cross-motion, plaintiffs respond with two alternative arguments. First, plaintiffs contend that the licensing agreements do not involve the transfer of a franchise within the scope of Section 1253. Second, plaintiffs argue that even assuming the licensing agreements included in part a transfer of a franchise within the scope of Section 1253, the agreements also transferred other intangible assets to the licensees—the Sort Program, "Licensed Technology," and "Trade Secrets"—which are not covered by Section 1253.[5] Plaintiffs argue that at a minimum, the revenues attributable to the transfer of these intangible assets should receive capital gains treatment.

A grant of summary judgement is appropriate only where there is no genuine issue of material fact (*i.e.*, a fact that might affect the outcome of the action) and the movant is entitled to judgement as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The moving party bears the burden of establishing the absence of any genuine issue of material fact. That burden may be discharged by pointing out to the court that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). "[T]he court must resolve all doubt respecting the presence or absence of factual issues in favor of the one against whom summary judgement is sought." *Union Carbide Corp. v. American Can Co.*, 724 F.2d 1567, 1571 (Fed.Cir.1984).

## II.

The Internal Revenue Code, Subtitle A, Chapter 1, Subchapter P, 26 U.S.C. §§ 1201–1297, describes the circumstances under which a transfer of assets constitutes the sale or exchange of capital assets qualifying for preferential capital gains tax treatment. Section 1253, part of Subchapter P and entitled "Transfers of franchises, trademarks, and trade names," was enacted in response to a series of conflicting court decisions dealing with the extent to which franchisees' payments to franchisors qualify for capital gains treatment. *See Moberg v. Commissioner*, 365 F.2d 337 (5th Cir.1966); *United States v. Wernentin*, 354 F.2d 757 (8th Cir. 1965); *Estate of Gowdey v. Commissioner*, 307 F.2d 816 (4th Cir.1962); *Moberg v. Commissioner*, 305 F.2d 800 (5th Cir.1962); *Dairy Queen of Oklahoma, Inc. v. Commissioner*, 250 F.2d 503 (10th Cir.1957). Section 1253(a) provides that "[a] transfer of a franchise, trademark, or trade name shall not be treated as a sale or exchange of a capital asset if the transferor retains any significant power, right, or continuing interest with respect to the subject matter of the franchise, trademark, or trade name." Thus, when applying Section 1253(a) to the instant facts, the court must make two pertinent determinations. First, the court must determine whether a transfer of a franchise is involved and, second, if such a transfer is involved, the court must determine whether Syncsort maintained the requisite "power, right, or continuing interest with respect to the subject matter of the franchise."

Turning to the first determination, Section 1253(b)(1) defines "franchise" as "includ[ing] an agreement which gives one of the parties to the agreement the right to distribute, sell, or provide goods, services, or facilities within a specified area." Herein, each of the four licensing agreements fits within that definition. As described above, in each agreement, Syncsort granted the licensee the exclusive right within a designated area to distribute and provide a specific product, *i.e.*, the Sort Program. Each agreement also provided the licensee with the right to use technological information and trade secrets to provide related services.

---

5. Plaintiffs identify these other intangible assets in various ways, including proprietary information and know-how. But plaintiffs never describe any proprietary information or know-how that does not fall within the three categories of intangible assets identified in the licensing agreements—the Sort Program, "Licensed Technology," and "Trade Secrets." Therefore, the court will focus exclusively on these three categories of intangible assets.

Turning to the second determination of whether Syncsort maintained a "significant power, right, or continuing interest with respect to the subject matter of the franchise," Section 1253(b)(2) provides:

Significant power, right, or continuing interest.—The term "significant power, right, or continuing interest" includes but is not limited to, the following rights with respect to the interest transferred:

(A) A right to disapprove any assignment of such interest, or any part thereof.

(B) A right to terminate at will.

(C) A right to prescribe the standards of quality of products used or sold, or of services furnished, and of the equipment and facilities used to promote such products or services.

(D) A right to require that the transferee sell or advertise only products or services of the transferor.

(E) A right to require that the transferee purchase substantially all of his supplies and equipment from the transferor.

(F) A right to payments contingent on the productivity, use, or disposition of the subject matter of the interest transferred, if such payments constitute a substantial element under the transfer agreement.

Herein, in each of the four agreements, Syncsort maintained significant rights over the subject matter of the franchise, *i.e.,* the Sort Program and the support services related to the Sort Program. In its agreements with Pandata, Shell, and Computing Benefits, Syncsort maintained the right to disapprove any assignment of the licensees' interest (Section 1253(b)(2)(A)) and to prescribe standards of quality for the copies of the Sort

Program that were sublicensed or subleased to end-users (Section 1253(b)(2)(C)). In its agreements with Computing Benefits and Software Engineering, Syncsort required the licensees to refrain from marketing any competitive computer programs (Section 1253(b)(2)(D)). In all four agreements, Syncsort received payments contingent on the use or disposition of the Sort Program and such payments constituted a substantial element under each transfer agreement (Section 1253(b)(2)(F)).[6] Thus, the four licensing agreements fall within the literal scope of Section 1253(a). Each agreement constitutes a transfer of a franchise and in each agreement, Syncsort retained significant rights with respect to the subject matter of that franchise.

### III.

■ Plaintiffs do not dispute that the literal reach of Section 1253 applies to the instant agreements. Plaintiffs do, however, dispute that Section 1253 should be applied literally herein. Plaintiffs contend that Congress intended Section 1253 to reach only those situations where the franchisor participates much more actively in the franchisee's business than did Syncsort.

■ Where, as here, the statutory language, in pertinent part, is unambiguous, a court must interpret the statute consistent with its unambiguous language unless the legislative history demonstrates "a clearly expressed legislative intention to the contrary." *Consumer Product Safety Commission v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980); *M.A. Mortenson Co. v. United States,* 996 F.2d 1177, 1181 (Fed.Cir.1993). Plaintiffs herein rely primarily upon the following portion of the legislative history of Section 1253, which appears in substantially

6. In addition to the rights specifically listed in Section 1253(b)(2), Syncsort maintained other rights, powers, and interests that can at least be argued to be "significant." In all four agreements, Syncsort, *inter alia,* retained control over the terms and/or conditions of sublicenses, maintained confidentiality with respect to information concerning the basic design of the Sort Program, and maintained standards over the display of Syncsort trademarks. The agreements with Pandata, Shell, and Computing Benefits also obliged

the licensees to disclose to Syncsort all modifications to or improvements of the Sort Program that the licensees invented, developed, or adopted during the terms of the licensing agreements. The agreements with Pandata, Shell, and Software Engineering also provided Syncsort with either some control over the price at which the licensees could sublicense or sublease the Sort Program or access to information concerning this price.

the same form in both of the pertinent Senate and House Committee Reports. The House Report provides, in relevant part:

> It would appear that the retention of significant rights, powers, or continuing interests by the franchisor in the subject matter of the franchise is equivalent to active operational control and is inconsistent with a sale of property.
>
> Moreover, it has been pointed out that some franchisors participate substantially in the day-to-day management of the franchisee's business activities and operations or, in other words, carry on what amounts to active commercial participation in the business by the transferor of the franchise. In other words, it would appear that the franchisor had reserved what may be regarded as an operational interest in the subfranchise if he participates in its management by conducting activities such as sales promotion (including advertising), sales and management training, employee training programs, holding of national meetings for franchisees, providing the franchisee with blue prints or formulas, and other forms of continuing assistance.

H.R.Rep. No. 413, 91st Cong., 1st Sess., pt. 1, 162 (1969). *See also* S.Rep. No. 552, 91st Cong., 1st Sess 208 (1969), U.S.Code Cong. & Admin.News 1969, 1645, 1815, 2241.

But this statement hardly constitutes a "clearly expressed legislative intention" that Congress intended Section 1253 to reach only those situations where the franchisor is involved in the management of the franchisee's business on a day-to-day basis. The observation that *some* franchisors participate substantially in the day-to-day management of the franchisee's business activities" (emphasis added) necessarily recognizes that other franchisors do not, but nothing in the quoted portion indicates that Congress intended Section 1253 to reach only the first group of franchisors. Moreover, the ultimate conclusion expressed in this portion of the legislative history is that the "retention of significant rights, powers, or continuing interests by the franchisor in the subject matter of the franchise is equivalent to active operational control and is inconsistent with the sale of property." In Section 1253(b)(2), Congress proceeded specifically to define those rights that it considered to be "significant" and hence "inconsistent with the sale of property." Thus, once the court determines that a transfer of a franchise is involved and that the franchisor retained significant rights as defined in Section 1253(b)(2), the court's inquiry, in pertinent part, is complete and Section 1253 necessarily applies. The legislative history of Section 1253 does not anticipate that in situations where the franchisor retains rights specifically listed in Section 1253(b)(2), the court will perform its own analysis to measure the significance of those rights to determine whether retention amounted to "operational control."

■ Herein, the right of each licensee to distribute and provide the Sort Program and related services constitutes a franchise within the meaning of Section 1253(b)(1), and with respect to that franchise, Syncsort maintained significant rights listed in Section 1253(b)(2). Therefore, under the mandate of Section 1253, plaintiffs are not entitled to claim long-term capital gains on payments allocable to these franchise transfers.[7]

## IV.

■ In the alternative, plaintiffs argue that even assuming each of the four licensing agreements included the transfer of a franchise within the scope of Section 1253, all royalty payments Syncsort received under the four licensing agreements should not necessarily be denied capital gains treatment. Plaintiffs argue that the phrase "transfer of a

7. Plaintiffs fault defendant for proposing an interpretation of Section 1253 herein that is inconsistent with the government's argument in *Tele-Communications, Inc. v. Commissioner*, 95 T.C. 495 (1990), aff'd, 12 F.3d 1005 (10th Cir.1993). Therein, the government argued that Section 1253 did not apply to cable television franchises even though such franchises literally fell within the definition of "franchise" contained in Section 1253(b)(1). But in *Tele-Communications*, the court rejected the government's argument and interpreted Section 1253 according to its literal terms so as to include cable television franchises. Certainly, the government cannot be estopped from promoting in one court a legal interpretation that had previously been adopted, over its objection, by another court.

franchise" in Section 1253(a) must be narrowly construed to encompass only the transfer of the naked intangible "right to distribute, sell, or provide goods, services, or facilities within a specified area." Plaintiffs contend that all other assets, tangible or intangible, that may be transferred in connection with the franchise fall outside of Section 1253(a), and hence must be evaluated for capital gains treatment under the other provisions of Subchapter P of the Internal Revenue Code.

Plaintiffs contend that in addition to granting the licensees the right to distribute the Sort Program, the license agreements also transferred the Sort Program, "Licensed Technology" and "Trade Secrets." Plaintiffs argue that the amount of payments made by the licensees attributable to the transfer of these other intangible assets falls outside of Section 1253(a) and qualifies for capital gains treatment. Because the license agreements provided for fixed royalty payments based on total revenues and did not allocate the payments among the transferred assets, plaintiffs argue that this court must allocate the royalty payments between payments attributable to the transfer of the naked "right to distribute ..." and payments attributable to the transfer of the Sort Program, "Licensed Technology," and "Trade Secrets."

### V.

The wording of Section 1253 and the pertinent legislative history do not support plaintiffs' proposed narrow interpretation of the phrase "transfer of a franchise." As noted above, Section 1253(b)(1) defines "franchise" as follows: "The term 'franchise' *includes* an agreement which gives one of the parties to the agreement the right to distribute, sell, or provide goods, services, or facilities, within a specified area" (emphasis added). By using the term "includes," the statutory definition is open ended. To say that the term franchise "includes" an agreement which contains a certain specified provision is to acknowledge that the term may also include other, unspecified arrangements. *See* 26 U.S.C. § 7701(c) ("The terms 'includes' and 'includ-

ing' when used in a definition contained in this title shall not be deemed to exclude other things otherwise within the meaning of the term defined."). *See also Tele–Communications, Inc. v. Commissioner,* 95 T.C. 495, 514 (1990), *aff'd,* 12 F.3d 1005 (10th Cir.1993) ("[Includes], therefore, conveys the conclusion that there are other items includable, though not specifically enumerated."). Plaintiffs err by interpreting Section 1253(b)(1) as though it states that a franchise "*is* an agreement which gives ... the right to distribute ..." rather than "*includes* an agreement which gives ... the right to distribute...."

A related indication in the statutory definition of "franchise" that plaintiffs' proposed interpretation is too narrow is that the statutory definition does not focus exclusively on the grant of the "right to distribute ..." but rather refers to the agreement which contains such a grant (" 'franchise' includes an agreement which gives ... the right to distribute ..."). The statutory focus on the "agreement" indicates that a "franchise" may include assets transferred in the same agreement other than the "right to distribute...."

The legislative history similarly does not favor plaintiffs' proposed interpretation of Section 1253. The House of Representatives enacted its version of the bill covering taxation of the transfer of a franchise prior to the Senate. The House version included a provision, Subsection 1252(a), which corresponds to 26 U.S.C. § 1253(a). Subsection 1252(a) of the House version provided:

> GENERAL RULE—A transfer of a franchise shall not be treated as a sale or exchange of a capital asset or of property to which section 1231 applies, if the transferor retains any significant power, right, or continuing interest with respect to the subject matter of the franchise.[8]

H.R. 13270, 91st Cong., 1st Sess. (1969). The House also included Subsection 1252(c) which purported to create an exception to the broad reach of Subsection 1252(a). Subsection 1252(c) provided:

---

**8.** The House bill defined franchise as follows: "The term 'franchise' means a franchise, distrib-

utorship, or other like interest."

EXCEPTION—Subsection (a) shall not apply with respect to amounts received or accrued, in connection with a transfer of a franchise, which are attributable to the transfer of all substantial rights to a patent, trademark, or trade name ..., to the extent such amounts are separately identified and are reasonable in amount.

*Id.*

Franchise agreements that provide the franchisee with the right to distribute products or to provide services in a particular area typically transfer to the franchisee rights to other intangible assets that are used in conducting the franchised business. Often these rights involve trademarks, trade names, technology, trade secrets, or patents. *See, e.g., Tele–Communications*, 95 T.C. 495; *Canterbury v. Commissioner*, 99 T.C. 223, 1992 WL 195963 (1992); *Leisure Dynamics, Inc. v. Commissioner*, 32 T.C.M. (CCH) 159 (1973), *rev'd and remanded*, 494 F.2d 1340 (8th Cir.1974); *Dairy Queen of Oklahoma, Inc. v. Commissioner*, 26 T.C. 61 (1956), *rev'd and remanded*, 250 F.2d 503 (10th Cir. 1957). In Subsection 1252(c) of its version of the bill, the House demonstrated its intent that notwithstanding the broad reach of Subsection 1252(a), a franchisor's transfer of substantial rights to a patent, trademark, or trade name potentially could be treated as the transfer of capital assets for federal income tax purposes. By labeling Subsection 1252(c) as an "EXCEPTION" to Subsection 1252(a), the House indicated its understanding that Subsection 1252(a) otherwise would have prevented such treatment, *i.e.*, that absent an express "EXCEPTION," payments made in connection with the transfer of a franchise that are attributable to the transfer of rights to a patent, trademark, or trade name would come within the scope of a Subsection 1252(a) "transfer of a franchise." Therefore, the House, in effect, did not share plaintiffs' belief that "transfer of a franchise" is limited only to the transfer of the intangible right to distribute a product or to provide a service in a specified area.

The "EXCEPTION" proposed in the House version of 26 U.S.C. § 1253 is not contained in the final version of the statute. But this omission does not indicate that Congress ultimately disagreed with the House's perception as to the broad reach of the phrase "transfer of a franchise." As enacted, Section 1253(a) achieves the same end that the House sought to achieve in Subsection 1252(c) of its version of the statute, *i.e.*, that payments made in connection with the transfer of a franchise that are attributable to the transfer of rights to trademarks, trade names, or patents shall be segregated and treated separately from the other payments for the transfer of a franchise. Instead of achieving this end by creating an "EXCEPTION" to Section 1253(a), Congress accomplished the same result by separately establishing the standards for the transfer of rights to trademarks and trade names in Section 1253(a) ("transfer of a franchise, trademark, or trade name"), and by relying upon an existing and separate statute, 26 U.S.C. § 1235, that specifically covers the taxation of transfers of patents.[9] Such a congressional intent is supported by the following explanation by the Senate Committee on Finance regarding the Committee's decision to delete Subsection 1252(c) from the House version:

> The rule provided by the House version of the bill would not apply with respect to amount received or accrued in connection with the transfer of a franchise which is attributable to the transfer of all substantial rights of a patent, trademark, or trade name, to the extent the amounts separately identified are reasonable in amount. The committee amendments, however, deleted these exceptions, since patents are treated specifically in section 1235 of the code and the committee amendments also apply the general franchise rules to transfers of trademarks and trade names.

Summary of H.R. 13270, Tax Reform Act of 1969, Committee on Finance, United States Senate, 91st Cong., 1st Session (1969).

---

9. Section 1235 provides, in pertinent part:
   § 1235. Sale or exchange of patents
   (a) General.—A transfer (other than by gift, inheritance, or devise) of property consisting of all substantial rights to a patent, or an undivided interest therein which includes a part of all such rights, by any holder shall be considered the sale or exchange of a capital asset....

Thus, although the Senate Committee acknowledged that amounts received by the franchisee for patents, trademarks, or trade names can be amounts received "in connection with the transfer of a franchise," the Senate Committee ultimately decided that payments for these three specific types of assets should be excluded from the "transfer of a franchise" language of proposed Subsection 1252(a), now Section 1253(a). Unfortunately for plaintiffs, however, there is no equivalent suggestion in the legislative history that Congress intended to exclude any other payments similarly made in connection with the "transfer of a franchise," specifically the payments for the type of intangible assets transferred herein, *i.e.,* the Sort Program, "Licensed Technology," and "Trade Secrets." Unlike with patents, there is no other statute that is specifically and exclusively directed to the taxation of transfers of these assets, and unlike with trademarks and trade names, Congress did not purport to exclude these assets when it enacted Section 1253.

## VI.

A franchise is a business. Congress enacted Section 1253 in response to a franchise boom in which franchisors licensed various assets to franchisees and thereby helped establish the franchisees in the business of distributing, selling, or providing the goods, services, or facilities within specified areas. *See* H.R.Rep. No. 413, 91st Cong., 1st Sess., pt. 1, 163 (1969); *Moberg v. Commissioner,* 365 F.2d 337 (5th Cir.1966); *Wernentin,* 354 F.2d 757; *Estate of Gowdey,* 307 F.2d 816;

*Moberg,* 305 F.2d 800; *Dairy Queen of Oklahoma,* 250 F.2d 503. To conduct the franchised business, a franchisee typically needs not only the naked right to distribute, sell, or provide, the goods, services, or facilities, but also other unique intangible assets that are integral to the providing of such goods, services, or facilities.[10] Plaintiffs' effort herein to interpret "transfer of a franchise" as limited to the transfer of the naked right to distribute, sell, or provide, and to exclude these other unique and integral intangible assets ignores the essential nature of the franchise as a business.

In the instant action, Syncsort, in effect, franchised aspects of its domestic business. Syncsort chose not to conduct its business in certain foreign markets on its own and instead to exploit its assets in foreign markets by licensing its business to existing foreign firms. The licenses granted the firms access to the Sort Program, "Licensed Technology," and "Trade Secrets," which Syncsort utilized in its United States business. Syncsort thereby, in effect, permitted the foreign firms to emulate Syncsort's domestic business in foreign markets.

The three assets at issue—the Sort Program, "Licensed Technology," and "Trade Secrets"—are unique intangible assets that are an integral part of each of the franchised businesses created in the agreements. There is no contention that these assets have use other than in connection with the franchised business, *i.e.,* other than in the provision of the Sort Program and related services.[11] The Sort Program is the essence of the franchise arrangements. Without access to

---

**10.** For example, in *Estate of Gowdey,* 307 F.2d at 818, the court, in examining the franchise agreements, noted that each "Licensee" was sold a composite group of rights which, while neither patent rights nor secret processes, nevertheless "all involve intangibles and have additional common qualities." In *Dairy Queen of Oklahoma,* 250 F.2d at 504, the court observed that in granting the exclusive right to the Dairy Queen business in the State of Oklahoma, the franchisor represented to the franchisee that it was "possessed of a certain formula together with the production methods and machinery requirements for the preparation, sale and distribution of a certain product known as Dairy Queen." Thereafter, the franchisee, in subfranchising the Dairy Queen business throughout Oklahoma, agreed in each "Dairy Queen Franchise Agree-

ment" to "supervise the installation of the machines, be responsible for production, furnish the Dairy Queen formula, assist in obtaining a source of supply ..., train key personnel, and otherwise assist in opening the first store." *Id.* at 505.

**11.** Assadour Tavitian explains in his supplemental affidavit that "[a]s a practical matter the knowledge of the "Trade Secrets" was of no use to the [franchisees] for consulting at a given end-user unless they sold [the Sort Program] first." Thus, this case does not raise the issue of the proper taxation of technology licenses where the technology can be utilized not only in the franchised business, but also in other distinct businesses.

the Sort Program, the franchisees would have no product to distribute. The "Licensed Technology" and "Trade Secrets" similarly are integral to the franchisees' ability to market and provide services relating to the Sort Program in the specified areas. The "Licensed Technology" allowed the franchisees to duplicate the Sort Program for sale to customers, and facilitated the franchisees' servicing and marketing of the Sort Program. The "Trade Secrets," which the franchisees specifically targeted in their pre-licensing communications with Syncsort, permitted the franchisees to offer increased efficiencies in the Sort Program's sorting process. (*See supra* note 3.) Hence, without the transfer of the Sort Program, "Licensed Technology," and "Trade Secrets," the licensees could not have distributed and provided the Sort Program and related services.

Viewing a "transfer of a franchise" as encompassing only the transfer of the intangible right to distribute products and provide services and not also as including the transfer of other unique intangible assets integral to the provision of such products and related services produces a fundamentally inaccurate picture of the business relationship created by a franchise transfer. This court will not promote such a distorted picture unless the statutory language or the legislative history requires such a result. As described above, the language and legislative history of Section 1253 point in the opposite direction and indicate that a "transfer of a franchise" includes more than merely the transfer of the naked right that plaintiffs propose here.

In summary, the court concludes that the three unique intangible assets plaintiffs transferred to the franchisees—the Sort Program, "Licensed Technology," and "Trade Secrets"—fall within the reach of "transfer of a franchise" under Section 1253. Hence, income received in connection with the transfer of the franchise that is attributable to the transfer of these three assets must be treated as ordinary income for federal income tax purposes.

\* This Opinion was filed unpublished on July 8, 1994. Thereafter, defendant filed a motion to publish pursuant to RCFC 52.1(b). We grant

### Conclusion

For the reasons set forth above, defendant's motion for summary judgment is granted, and plaintiffs' cross-motion for summary judgment is denied. As requested by defendant, defendant's counterclaim is dismissed. The Clerk of the Court shall enter judgment accordingly. No costs.

IT IS SO ORDERED.